# United States Court of Appeals
# for the Federal Circuit

_____

**DDR HOLDINGS, LLC,**
*Plaintiff-Appellee,*

**v.**

**HOTELS.COM, L.P., CENDANT TRAVEL
DISTRIBUTION SERVICES GROUP, INC.,
EXPEDIA, INC., TRAVELOCITY.COM, L.P.,
SITE59.COM, LLC, INTERNATIONAL CRUISE &
EXCURSION GALLERY, INC.,
OURVACATIONSTORE, INC., INTERNETWORK
PUBLISHING CORPORATION, AND ORBITZ
WORLDWIDE, LLC,**
*Defendants,*

AND

**NATIONAL LEISURE GROUP, INC. AND
WORLD TRAVEL HOLDINGS, INC.,**
*Defendants-Appellants,*

AND

**DIGITAL RIVER, INC.,**
*Defendant.*

_____

2013-1505

_____

Appeal from the United States District Court for the Eastern District of Texas in No. 06-CV-0042, Judge J. Rodney Gilstrap.

———————————

Decided: December 5, 2014

———————————

LOUIS J. HOFFMAN, Hoffman Patent Firm, of Scottsdale, Arizona, argued for plaintiff-appellee. On the brief was IAN B. CROSBY, Susman Godfrey LLP, of Seattle, Washington.

NORMAN H. ZIVIN, Cooper & Dunham LLP, of New York, New York, argued for defendants-appellants, National Leisure Group, Inc., et al. With him on the brief was TONIA A. SAYOUR.

———————————

Before WALLACH, MAYER, and CHEN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* CHEN. Dissenting opinion filed by *Circuit Judge* MAYER.

CHEN, *Circuit Judge*.

Defendants-Appellants National Leisure Group, Inc. and World Travel Holdings, Inc. (collectively, NLG) appeal from a final judgment of the United States District Court for the Eastern District of Texas entered in favor of Plaintiff-Appellee DDR Holdings, LLC (DDR). Following trial, a jury found that NLG infringes the asserted claims of U.S. Patent Nos. 6,993,572 (the '572 patent) and 7,818,399 (the '399 patent). The jury also found the asserted claims of the '572 and '399 patents are not invalid. The district court denied NLG's renewed motion for judgment as a matter of law (JMOL) on, *inter alia*, noninfringement and invalidity of the asserted patents. The district court subsequently entered a final judgment

consistent with the jury's findings on infringement, validity, and damages, and awarded DDR pre- and post-judgment interest and costs. We affirm the district court's denial of NLG's motions for JMOL of noninfringement and invalidity of the '399 patent. Because we conclude that the '572 patent is anticipated as a matter of law, we reverse the district court's denial of JMOL on the validity of the '572 patent, and remand to the district court for further proceedings consistent with our decision.

## I. BACKGROUND

DDR is the assignee of the '572 and '399 patents. The '572 and '399 patents are both continuations of U.S. Patent No. 6,629,135 (the '135 patent), which has a priority date of September 17, 1998. Each of these patents is directed to systems and methods of generating a composite web page that combines certain visual elements of a "host" website with content of a third-party merchant. For example, the generated composite web page may combine the logo, background color, and fonts of the host website with product information from the merchant. '135 patent, 12:46–50.

The common specification of the patents-in-suit explains that prior art systems allowed third-party merchants to "lure the [host website's] visitor traffic away" from the host website because visitors would be taken to the third-party merchant's website when they clicked on the merchant's advertisement on the host site. *Id.* at 2:26–30. The patents-in-suit disclose a system that provides a solution to this problem (for the host) by creating a new web page that permits a website visitor, in a sense, to be in two places at the same time. On activation of a hyperlink on a host website—such as an advertisement for a third-party merchant—instead of taking the visitor to the merchant's website, the system generates and directs the visitor to a composite web page that displays product information from the third-party mer-

chant, but retains the host website's "look and feel." *Id.* at 3:9–21. Thus, the host website can display a third-party merchant's products, but retain its visitor traffic by displaying this product information from within a generated web page that "gives the viewer of the page the impression that she is viewing pages served by the host" website. *Id.* at 2:56–63, 3:20–22.

Representative claim 13 of the '572 patent recites:

13. An e-commerce outsourcing system comprising:

a) a data store including a look and feel description associated with a host web page having a link correlated with a commerce object; and

b) a computer processor coupled to the data store and in communication through the Internet with the host web page and programmed, upon receiving an indication that the link has been activated by a visitor computer in Internet communication with the host web page, to serve a composite web page to the visitor computer wit[h] a look and feel based on the look and feel description in the data store and with content based on the commerce object associated wit[h] the link.

System claim 13 requires that the recited system provide the host website with a "link" that "correlate[s]" the host website with a "commerce object." The "commerce object" is the product or product catalog of the merchant. '135 patent, 3:7–13. After recognizing that a website visitor has activated the link, the system retrieves data from a "data store" that describes the "look and feel" of the host web page, which can include visual elements such as logos, colors, fonts, and page frames. *Id.* at 12:46–50. The claimed system then constructs a composite web page comprising a "look and feel" based on the look and

feel description in the data store along with content based on product information from the associated merchant's product catalog.

The '399 patent is directed to a similar system with a greater emphasis on a "scalable [computer] architecture" to serve "dynamically constructed [web] pages" associated with multiple host website and merchant pairs. '135 patent, 3:32–36. Representative claim 19 of the '399 patent recites:

> 19. A system useful in an outsource provider serving web pages offering commercial opportunities, the system comprising:
>
> (a) a computer store containing data, for each of a plurality of first web pages, defining a plurality of visually perceptible elements, which visually perceptible elements correspond to the plurality of first web pages;
>
> > (i) wherein each of the first web pages belongs to one of a plurality of web page owners;
> >
> > (ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and
> >
> > (iii) wherein the selected merchant, the outsource provider, and the owner of the first web page displaying the associated link are each third parties with respect to one other;
>
> (b) a computer server at the outsource provider, which computer server is coupled to the computer store and programmed to:
>
> > (i) receive from the web browser of a computer user a signal indicating activation of one of

the links displayed by one of the first web pages;

(ii) automatically identify as the source page the one of the first web pages on which the link has been activated;

(iii) in response to identification of the source page, automatically retrieve the stored data corresponding to the source page; and

(iv) using the data retrieved, automatically generate and transmit to the web browser a second web page that displays: (A) information associated with the commerce object associated with the link that has been activated, and (B) the plurality of visually perceptible elements visually corresponding to the source page.

Similar to claim 13 of the '572 patent, system claim 19 of the '399 patent requires that a "data store" hold "visually perceptible elements" (or "'look and feel' elements") that "visually . . . correspond" to a host web page. The host web page must include a link associated with a "buying opportunity" with a merchant. Once a visitor activates this link, the claimed system generates and transmits to the website visitor's web browser a composite web page that includes product information of the merchant and the "look and feel" of the host website (i.e., "the plurality of visually perceptible elements visually corresponding to the [host web] page").

Claim 19 further requires that the data store must store "look and feel" descriptions for multiple hosts and that each link must be associated with a particular merchant's product catalog. Claim 19 also requires that the merchant, system operator, and host website be "third parties with respect to one another." When a website visitor activates a link associated with a merchant's

product catalog, the claimed system identifies the host web page and then transmits a composite web page using the proper "look and feel" elements of the host website in the data store and the product information from the associated merchant.

The '572 patent issued on January 31, 2006. On the same day, DDR filed suit against NLG, Digital River, Inc. (Digital River), and nine other defendants, asserting infringement of various claims of the '135 and '572 patents. NLG is a travel agency that sells cruises in partnership with travel-oriented websites and major cruise lines through the Internet. DDR's suit accused NLG of infringing the '135 and '572 patents by providing a system for cruise-oriented (host) websites that allows visitors to book cruises on major cruise lines (merchants). Joint Appendix (J.A.) 261. In particular, when a visitor on one of these cruise-oriented (host) websites clicks on an advertisement for a cruise, NLG's system generates and directs the visitor to a composite web page that incorporates "look and feel" elements from the host website and product information from the cruise line (merchant).

DDR's suit was stayed during the pendency of an *ex parte* reexamination of the '135 and '572 patents requested by DDR that was based on prior art identified by the defendants. Shortly after the U.S. Patent and Trademark Office confirmed the validity of the '135 and '572 patents and the stay was lifted, the '399 patent issued on October 19, 2010. DDR subsequently amended its complaint to assert infringement of this patent by several of the defendants, including NLG.

During *Markman* proceedings, the parties stipulated to a construction of several terms, including "look and feel," which appears in each of the asserted claims of the '572 patent, and "visually perceptible elements," which appears in each of the asserted claims of the '399 patent. J.A. 542. For "look and feel," the parties agreed to a

construction of: "A set of elements related to visual appearance and user interface conveying an overall appearance identifying a website; such elements include logos, colors, page layout, navigation systems, frames, 'mouseover' effects, or others elements consistent through some or all of the website." *Id.* For "visually perceptible elements," the parties agreed to a construction of: "look and feel elements that can be seen." *Id.* The defendants, however, expressly reserved their rights to argue that both the "look and feel" and "visually perceptible elements" terms are indefinite, but offered the stipulated constructions "in the alternative." *Id.*

Between June 2012 and January 2013, DDR settled with all defendants except for NLG and Digital River. The case eventually proceeded to a jury trial in October 2012. At trial, DDR accused NLG and Digital River of direct and willful infringement of claims 13, 17, and 20 of the '572 patent, and accused NLG—but not Digital River—of direct and willful infringement of claims 1, 3, and 19 of the '399 patent. DDR also accused NLG and Digital River of inducing infringement of claim 17 of the '572 patent.

The jury found that NLG and Digital River directly infringed the asserted claims of the '572 patent and that NLG directly infringed the asserted claims of the '399 patent, but that NLG and Digital River's infringement was not willful. The jury found that NLG and Digital River did not induce infringement of claim 17 of the '572 patent. The jury also found that the asserted claims were not invalid. The jury determined DDR was entitled to $750,000 in damages from both NLG and Digital River for infringing DDR's patents.

At the conclusion of trial, NLG and Digital River renewed motions for JMOL pursuant to Rule 50(b) of the Federal Rules of Civil Procedure (FRCP) on several grounds. NLG contended the asserted claims of the '572

and '399 patents are invalid under 35 U.S.C. § 101 because the claims are directed to patent-ineligible subject matter and invalid under 35 U.S.C. § 112 ¶ 2[1] because the terms "look and feel" and "visually perceptible elements" are indefinite. NLG also contended that neither the jury's finding of infringement nor its award of damages was supported by substantial evidence. NLG also alleged the district court made several unfair and prejudicial evidentiary rulings.

Digital River contended that the asserted claims of the '572 patent are invalid as either anticipated under 35 U.S.C. § 102, obvious under 35 U.S.C. § 103, or indefinite under 35 U.S.C. § 112 ¶ 2. Digital River also contended that the jury's finding of infringement was not supported by substantial evidence. Digital River moved for a new trial pursuant to FRCP 59.

The district court denied NLG and Digital River's motions for JMOL and Digital River's FRCP 59 motion for a new trial. Over the defendants' objections, the district court awarded DDR an additional $284,404 in prejudgment interest pursuant to 35 U.S.C. § 284. The district court entered a final judgment in favor of DDR, and NLG and Digital River timely appealed. NLG and Digital River's appeals were consolidated and fully briefed. Prior to oral argument, DDR and Digital River settled, and we granted Digital River's motion to terminate its appeal. D.I. 65, 68. NLG's appeal continued. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

---

[1] Paragraph 2 of 35 U.S.C. § 112 was replaced with newly designated § 112(b) when § 4(c) of the America Invents Act (AIA), Pub. L. No. 112-29, took effect on September 16, 2012. Because the applications resulting in the patents at issue in this case were filed before that date, we will refer to the pre-AIA version of § 112.

## II. DISCUSSION

Since the denial of a motion for JMOL is not patent law-specific, regional circuit law applies. The Fifth Circuit reviews the denial of a JMOL motion *de novo*. *See, e.g.*, *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1248 (Fed. Cir. 2005). In the Fifth Circuit, JMOL is appropriate if "the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict." *Id.* The Court "must presume that the jury resolved all factual disputes in the [prevailing party's] favor." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347 (Fed. Cir. 2012) (applying Fifth Circuit law to the review of a district court's grant of JMOL).

### A. Anticipation

We turn first to the district court's denial of Digital River's motion for JMOL of invalidity of the '572 patent based on 35 U.S.C. § 102(a). A patent claim is anticipated if a single prior art reference expressly or inherently discloses every limitation of the claim. *See, e.g.*, *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 975 (Fed. Cir. 2010). Anticipation challenges under § 102 must focus only on the limitations actually recited in the claims. *See Constant v. Adv. Micro-Devices, Inc.*, 848 F.2d 1560, 1570–71 (Fed. Cir. 1988) (finding "limitations [] not found anywhere in the claims" to be irrelevant to an anticipation challenge). Whether a reference discloses a limitation is a question of fact, and a jury's findings on questions of fact are reviewed for substantial evidence. *See, e.g.*, *Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998). Invalidity by anticipation must be proven by clear and convincing evidence. *See Microsoft Corp. v. i4i L.P.*, 131 S. Ct. 2238, 2242 (2011).

On appeal, the parties only dispute whether Digital River's prior art Secure Sales System (SSS) satisfies the

"look and feel" limitation; DDR does not dispute that the SSS satisfies every other limitation of the '572 patent's asserted claims. NLG, which adopted Digital River's anticipation challenge to the '572 patent,[2] argues that no evidence supports the jury's finding that the SSS does not disclose the "look and feel" limitation, since it showed the jury multiple examples of composite web pages generated by the SSS with a "look and feel" based on a set of "look and feel" elements from the corresponding host website.

DDR contends that, as the district court determined, "it is up to the trier of fact to determine whether the combination of elements making up the overall appear-

_____

[2] Even though Digital River terminated its appeal prior to oral argument, it did not do so until after the parties had fully completed their briefing. In its own briefs, although only in footnotes, NLG incorporated by reference Digital River's arguments on anticipation. Appellant's Br. 43 n.23; Appellant's Reply Br. 9 n.5. In a consolidated case such as here, Rule 28(i) of the Federal Rules of Appellate Procedure (FRAP) permits "any party [to] adopt by reference a part of another's brief." *See, e.g.*, *Pozen Inc. v. Par Pharm. Inc.*, 696 F.3d 1151, 1159 n.3 (Fed. Cir. 2012); *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1294 n.1 (Fed. Cir. 2007). *Compare Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 910 (Fed. Cir. 2014) (co-parties in non-consolidated appeals cannot use incorporation pursuant to FRAP 28(i) to exceed word count limits prescribed by FRAP 32(a)(7)). DDR implicitly *concedes* that NLG has adequately adopted Digital River's anticipation defense as to the '572 patent, acknowledging that "[NLG] did not adopt Digital River's anticipation defense or seek to extend it to prove anticipation *of the '399 patent*, which has claims containing extra elements not found in the asserted claims of the '572 patent." Appellee's Br. 44 n.10 (emphasis added).

ance of a website has a similar 'look and feel' as compared to another website." *DDR Holdings, LLC v. Hotels.com, L.P.*, 954 F. Supp. 2d 509, 517 (E.D. Tex. 2013). DDR contends that the jury reviewed substantial evidence that Digital River's SSS did not replicate the host website's "look and feel" in terms of "overall appearance" and that the web pages generated by the SSS did not show "correspondence of overall appearance." In particular, DDR argues that the SSS did not satisfy this limitation since it did not replicate a sufficient number of "look and feel" elements from the host web page. Appellee's Br. 45–46.

We find that the record allows only one reasonable finding: clear and convincing evidence establishes that Digital River's prior art SSS anticipates the asserted claims of the '572 patent. The record lacks substantial evidence to support the jury's finding that the asserted claims of the '572 patent are not anticipated. Therefore, the district court erred by denying the defendants' motion for JMOL of invalidity of the '572 patent under 35 U.S.C. § 102(a).

Digital River's prior art SSS was operational and sold to its first customer by August 12, 1996. J.A. 6618–23. By August 1997, more than a year before the filing date of the provisional application for the '135 patent, Digital River's SSS had attracted its 500th customer. J.A. 6257. Digital River advertised its SSS as a system for generating web pages that allowed website visitors to "purchase and download the digital products of their choice," but still "retain[ed] the *look and feel* of [the host's] site." J.A. 6202 (emphasis added). The SSS was activated when visitors on a host's website clicked a "web site 'buy' button" hyperlink. J.A. 6320. Digital River's advertisements explained that "[w]hen [website visitor] customers want to purchase, they push the 'buy' button and are transferred immediately and transparently to the Digital River Central Commerce Server." J.A. 6202. This component of the SSS then generated and served composite web pages to

website visitors that incorporated "look and feel" elements of the host website and product information associated with the host website's "web store" in a manner that "replicate[d] the *look and feel* of the [host's] Web site." J.A. 6320 (emphasis added). These "look and feel" elements and this product information content were stored by Digital River in a data warehouse and retrieved for incorporation into the generated composite web page based on a correlation with the "buy" button hyperlink on the host website. *See id.* In this way, Digital River's SSS would allow "transaction[s to] take[] place in the selling environment [the host website had] created, surrounded by the *look and feel* of [the host website's] identity. . . . There [would be] no sensation [for a website visitor] of being suddenly hustled off to another location." J.A. 6123 (emphasis added).

During trial, a Digital River witness testified at length on how the SSS generated composite web pages with "look and feel" elements from host websites, and operated the SSS for the jury. Digital River also showed the jury several composite web pages generated by the SSS for host websites before the earliest priority date of the '572 patent, including a composite web page that incorporated several elements identified in DDR's patents or by DDR's expert at trial as "look and feel elements": the host website's logo, background color, and prominent circular icons. J.A. 8856–57 (composite web page), 7502 (host website); *see also* J.A. 8858–61 (composite web page incorporating host website logo, colors, fonts), 6122 (example web page from host website).

The parties' stipulated construction of "look and feel" requires the generated composite web page to include a set of elements from the host website, each of these elements being a "look and feel element" described in the specification that "convey[s] an overall appearance identifying a website." J.A. 542. Consistent with the specification, the stipulated construction defines these "look and

feel elements" that "convey an overall appearance identifying a website" to "include logos, colors, page layout, navigation systems, frames, 'mouse-over' effects, or other elements that are consistent through some or all of a Host's website." *Id.*; *see also* '572 patent, 14:11–14. Digital River's SSS clearly satisfies this limitation. For example, Digital River showed the jury a host website that included a stylized logo, a particular background color, and prominent circular icons. J.A. 7502. The SSS generated a prior art composite web page that incorporated each of these "look and feel" elements. J.A. 8856–57; *see also* J.A. 6172 (host website) and 6171 (SSS-generated prior art composite web page incorporating logo, navigational menu, and color "look and feel" elements). And as explained above, the SSS was consistently promoted and advertised as creating a composite web page that retained the "look and feel" of the host website. *E.g.*, J.A. 6123, 6202, 6320.

Both the district court and DDR introduced a limitation found neither in the '572 patent's claims nor the parties' stipulated construction. In particular, the district court introduced a requirement that the generated composite web page have an "overall match" in appearance with the host website, beyond what is expressly recited by the claims. *DDR Holdings*, 954 F. Supp. 2d at 517; *see also* Appellee's Br. 47. There is nothing, however, in the parties' stipulated construction of "look and feel," the claim language, or the specification that requires the generated composite web page to match the host website or to incorporate a specific number, proportion, or selection of the identified "look and feel" elements on a host website.

In order to satisfy this limitation, it is sufficient that "look and feel" elements identifying the host website are transferred to and displayed on the generated composite webpage. For example, independent claim 13 of the '572 patent merely requires that the generated composite web

page have a "look and feel based on the look and feel description in the data store and content based on the commerce object associated wit[h] the link." Independent claim 17 requires only that the generated composite web page have a "look and feel corresponding to the stored look and feel description" of the host website. There is no claim language requiring an "overall match" or a specific number of "look and feel" elements.

Further, the common specification explains that "[t]he look and feel is captured by selecting an example page [from] the host, retrieving the sample page from the host, identifying the look and feel elements from the sample page, and saving the identified look and feel elements." '572 patent, 14:7–10. Nothing in the common specification suggests that satisfaction of the "look and feel" limitation requires more than mechanically identifying "look and feel elements" from a web page on the host website, storing these elements in a data store, and using these stored "look and feel elements" to create the "look and feel" of the generated composite web page.

The jury's determination that the SSS does not anticipate claims 13, 17, and 20 of the '572 patent is not supported by substantial evidence. Therefore, the district court erred by denying the defendants' motion for JMOL of invalidity of the '572 patent under 35 U.S.C. § 102(a).[3]

## B. Patent-eligible subject matter

NLG also contends that the district court erred by denying its motion for JMOL that the asserted claims of

---

[3] Neither Digital River nor NLG ever argued that the '399 patent is invalid as anticipated by or obvious over prior art. We decline to speculate whether Digital River's prior art SSS, either alone or in combination with other prior art, invalidates the '399 patent under 35 U.S.C. §§ 102 or 103.

the '572 and '399 patents are invalid under 35 U.S.C. § 101. Since the '572 patent is invalid as anticipated under 35 U.S.C. § 102(a), we focus on NLG's § 101 challenge to claims 1, 3, and 19 of the '399 patent. We conclude, as did the district court, that the asserted claims of the '399 patent clear the § 101 hurdle.

We review the district court's determination of patent eligibility under 35 U.S.C. § 101 *de novo*. *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012). In *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012), the Supreme Court set forth an analytical framework under § 101 to distinguish patents that claim patent-ineligible laws of nature, natural phenomena, and abstract ideas—or add too little to such underlying ineligible subject matter—from those that claim patent-eligible applications of those concepts. First, given the nature of the invention in this case, we determine whether the claims at issue are directed to a patent-ineligible abstract idea. *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). If so, we then consider the elements of each claim—both individually and as an ordered combination—to determine whether the additional elements transform the nature of the claim into a patent-eligible application of that abstract idea. *Id.* This second step is the search for an "inventive concept," or some element or combination of elements sufficient to ensure that the claim in practice amounts to "significantly more" than a patent on an ineligible concept. *Id.*

Distinguishing between claims that recite a patent-eligible invention and claims that add too little to a patent-ineligible abstract concept can be difficult, as the line separating the two is not always clear. At one time, a computer-implemented invention was considered patent-eligible so long as it produced a "useful, concrete and tangible result." *State St. Bank & Trust Co. v. Signature Fin. Grp., Inc.*, 149 F.3d 1368, 1373 (Fed. Cir. 1998) (finding a machine that transformed data by a series of

mathematical calculations to a final share price to be patent-eligible); *see also In re Alappat*, 33 F.3d 1526, 1544 (Fed. Cir. 1994) (en banc). This understanding rested, in large part, on the view that such inventions crossed the eligibility threshold by virtue of being in the technological realm, the historical arena for patented inventions. *See, e.g., In re Bilski*, 545 F.3d 943, 952, 954–56 (Fed. Cir. 2008) (en banc) (concluding that a patent-eligible process must either be "tied to a particular machine or apparatus" or transformed into a different state or thing, i.e., the "machine-or-transformation test").

While the Supreme Court in *Bilski v. Kappos* noted that the machine-or-transformation test is a "useful and important clue" for determining patent eligibility, 130 S. Ct. 3218, 3227 (2010), it is clear today that not all machine implementations are created equal. For example, in *Mayo*, the Supreme Court emphasized that satisfying the machine-or-transformation test, by itself, is not sufficient to render a claim patent-eligible, as not all transformations or machine implementations infuse an otherwise ineligible claim with an "inventive concept." *See* 132 S. Ct. at 1301 ("[S]imply implementing a mathematical principle on a physical machine, namely a computer, [i]s not a patentable application of that principle.") (describing *Gottschalk v. Benson*, 409 U.S. 63, 64 (1972)). And after *Alice*, there can remain no doubt: recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible. 134 S. Ct. at 2358. The bare fact that a computer exists in the physical rather than purely conceptual realm "is beside the point." *Id.*

Although the Supreme Court did not "delimit the precise contours of the 'abstract ideas' category" in resolving *Alice*, 134 S. Ct. at 2356–57, over the course of several cases the Court has provided some important principles. We know that mathematical algorithms, including those executed on a generic computer, are abstract ideas. *See Benson*, 409 U.S. at 64. We know that some fundamental

economic and conventional business practices are also abstract ideas. *See Bilski*, 130 S. Ct. at 3231 (finding the "fundamental economic practice" of hedging to be patent ineligible); *Alice*, 134 S. Ct. at 2356 (same for intermediated settlement).

In some instances, patent-ineligible abstract ideas are plainly identifiable and divisible from the generic computer limitations recited by the remainder of the claim. For example, the Supreme Court in *Alice* determined that the claims at issue "simply instruct[ed] the practitioner to implement the abstract idea of intermediated settlement on a generic computer." 134 S. Ct. at 2359. In *Ultramercial, Inc. v. Hulu, LLC*, ___ F.3d ___, 2014 WL 5904902, at *5 (Fed. Cir. Nov. 14, 2014), the claims merely recited the abstract idea of using advertising as a currency as applied to the particular technological environment of the Internet. In *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014), the claims recited no more than using a computer to send and receive information over a network in order to implement the abstract idea of creating a "transaction performance guaranty." In *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344–45 (Fed. Cir. 2013), the claims merely recited "generalized software components arranged to implement an abstract concept [of generating insurance-policy-related tasks based on rules to be completed upon the occurrence of an event] on a computer." And in *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012), the claims recited no more than the use of a computer "employed only for its most basic function, the performance of repetitive calculations," to implement the abstract idea of managing a stable-value protected life insurance policy. Under Supreme Court precedent, the above claims were recited too broadly and generically to be considered sufficiently specific and meaningful applications of their underlying abstract ideas. Although many of the claims recited various com-

puter hardware elements, these claims in substance were directed to nothing more than the performance of an abstract business practice on the Internet or using a conventional computer. Such claims are not patent-eligible.

Against this background, we turn to the '399 patent's asserted claims. We begin our § 101 analysis at *Mayo/Alice* step one: determining whether the computer-implemented claims at issue here are "directed to" a patent-ineligible abstract idea.[4] Here, we note that the '399 patent's asserted claims do not recite a mathematical algorithm. Nor do they recite a fundamental economic or longstanding commercial practice. Although the claims address a business challenge (retaining website visitors), it is a challenge particular to the Internet.

Indeed, identifying the precise nature of the abstract idea is not as straightforward as in *Alice* or some of our other recent abstract idea cases. NLG's own varying formulations of the underlying abstract idea illustrate this difficulty. NLG characterizes the allegedly abstract idea in numerous ways, including "making two web pages look the same," "syndicated commerce on the computer using the Internet," and "making two e-commerce web pages look alike by using licensed trademarks, logos, color schemes and layouts." *See, e.g.*, Appellant's Br. 18–20. The dissent characterizes DDR's patents as describing the entrepreneurial goal "that an online merchant's sales can be increased if two web pages have the same 'look and feel.'" Dissenting Op. 2. But as discussed below, under

---

[4] The parties do not dispute that the asserted system and method claims of the '399 patent, for the purposes of § 101, are no different in substance. *See* Appellee Br. 63; Appellant Br. 24. Thus, the form of the asserted claims (system or method) does not affect our analysis of their patent eligibility. *See Alice*, 134 S. Ct. at 2360.

any of these characterizations of the abstract idea, the '399 patent's claims satisfy *Mayo/Alice* step two.

As an initial matter, it is true that the claims here are similar to the claims in the cases discussed above in the sense that the claims involve both a computer and the Internet. But these claims stand apart because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.

In particular, the '399 patent's claims address the problem of retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after "clicking" on an advertisement and activating a hyperlink. For example, asserted claim 19 recites a system that, among other things, 1) stores "visually perceptible elements" corresponding to numerous host websites in a database, with each of the host websites displaying at least one link associated with a product or service of a third-party merchant, 2) on activation of this link by a website visitor, automatically identifies the host, and 3) instructs an Internet web server of an "outsource provider" to construct and serve to the visitor a new, hybrid web page that merges content associated with the products of the third-party merchant with the stored "visually perceptible elements" from the identified host website. *See supra* 5.

In more plain language, upon the click of an advertisement for a third-party product displayed on a host's website, the visitor is no longer transported to the third party's website. Instead, the patent claims call for an "outsource provider" having a web server which directs the visitor to an automatically-generated hybrid web page

that combines visual "look and feel" elements from the host website and product information from the third-party merchant's website related to the clicked advertisement.[5] In this way, rather than instantly losing visitors to the third-party's website, the host website can instead send its visitors to a web page on the outsource provider's server that 1) incorporates "look and feel" elements from the host website, and 2) provides visitors with the opportunity to purchase products from the third-party merchant without actually entering that merchant's website.

The dissent suggests that the "store within a store" concept, such as a warehouse store that contains a kiosk for selling a third-party partner's cruise vacation packages, is the pre-Internet analog of the '399 patent's asserted claims. Dissenting Op. 4. While that concept may have been well-known by the relevant timeframe, that practice did not have to account for the ephemeral nature of an Internet "location" or the near-instantaneous transport between these locations made possible by standard Internet communication protocols, which introduces a problem that does not arise in the "brick and mortar" context. In particular, once a customer enters a physical warehouse store, that customer may encounter a kiosk selling third-

---

[5]    On a fundamental level, the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions. *See, e.g.*, *Parks v. Booth*, 102 U.S. 96, 102 (1880) ("Modern inventions very often consist merely of a new combination of old elements or devices, where nothing is or can be claimed except the new combination."); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–19 (2007) ("[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.").

party cruise vacation packages. There is, however, no possibility that by walking up to this kiosk, the customer will be suddenly and completely transported outside the warehouse store and relocated to a separate physical venue associated with the third-party—the analog of what ordinarily occurs in "cyberspace" after the simple click of a hyperlink—where that customer could purchase a cruise package without any indication that they were previously browsing the aisles of the warehouse store, and without any need to "return" to the aisles of the store after completing the purchase. It is this challenge of retaining control over the attention of the customer in the context of the Internet that the '399 patent's claims address.

We caution, however, that not all claims purporting to address Internet-centric challenges are eligible for patent. For example, in our recently-decided *Ultramercial* opinion, the patentee argued that its claims were "directed to a specific method of advertising and content distribution that was previously unknown and never employed on the Internet before." 2014 WL 5904902, at *3. But this alone could not render its claims patent-eligible. In particular, we found the claims to merely recite the abstract idea of "offering media content in exchange for viewing an advertisement," along with "routine additional steps such as updating an activity log, requiring a request from the consumer to view the ad, restrictions on public access, and use of the Internet." *Id.* at *5.

The '399 patent's claims are different enough in substance from those in *Ultramercial* because they do not broadly and generically claim "use of the Internet" to perform an abstract business practice (with insignificant added activity). Unlike the claims in *Ultramercial*, the claims at issue here specify how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink. Instead of the computer network operating in

its normal, expected manner by sending the website visitor to the third-party website that appears to be connected with the clicked advertisement, the claimed system generates and directs the visitor to the above-described hybrid web page that presents product information from the third-party and visual "look and feel" elements from the host website. When the limitations of the '399 patent's asserted claims are taken together as an ordered combination, the claims recite an invention that is not merely the routine or conventional use of the Internet.

It is also clear that the claims at issue do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same, or of any other variant suggested by NLG. Rather, they recite a specific way to automate the creation of a composite web page by an "outsource provider" that incorporates elements from multiple sources in order to solve a problem faced by websites on the Internet. As a result, the '399 patent's claims include "additional features" that ensure the claims are "more than a drafting effort designed to monopolize the [abstract idea]." *Alice*, 134 S. Ct. at 2357. In short, the claimed solution amounts to an inventive concept for resolving this particular Internet-centric problem, rendering the claims patent-eligible.

In sum, the '399 patent's claims are unlike the claims in *Alice, Ultramercial, buySAFE, Accenture*, and *Bancorp* that were found to be "directed to" little more than an abstract concept. To be sure, the '399 patent's claims do not recite an invention as technologically complex as an improved, particularized method of digital data compression. But nor do they recite a commonplace business method aimed at processing business information, applying a known business process to the particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operations, such as the claims

in *Alice*, *Ultramercial*, *buySAFE*, *Accenture*, and *Bancorp*. The claimed system, though used by businesses, is patent-eligible under § 101.[6] The district court did not err in denying NLG's motion for JMOL of invalidity under 35 U.S.C. § 101 as to these claims.

## C. Indefiniteness

In its motion for JMOL of invalidity, NLG also sought to invalidate the asserted claims of the '572 and '399 patents on the ground that the terms "look and feel" and "visually perceptible elements" render the claims indefinite because they are impermissibly subjective and fail to notify the public of the bounds of the claimed invention.[7] On appeal, NLG contends that the district court erred by denying its motion. We disagree.

Since the '572 patent's asserted claims are invalid under 35 U.S.C. § 102(a), we need not decide NLG's indefiniteness challenge to the patent based on the term "look and feel." We thus focus our analysis on the term "visually perceptible elements" in the '399 patent's asserted claims. The parties stipulated to a construction of the

---

[6] Of course, patent-eligible does not mean patent*able* under, *e.g.*, 35 U.S.C. §§ 102 and 103. As discussed in footnote 3 *supra*, the patent*ability* of the '399 patent's asserted claims is not before us.

[7] Though NLG contended that the term "look and feel" is indefinite before the district court, on appeal NLG shifts its focus to "look and feel *description*." "Look and feel" and "look and feel description," while related, are recited as separate terms within the asserted claims. *E.g.*, '572 patent, claim 13 (". . . a *look and feel* based on the *look and feel description* in the data store . . ."). NLG provides no explanation or justification for its shift in focus. As does DDR in its briefing, we focus our analysis on the term "look and feel."

term as "'look and feel' elements that can be seen." J.A. 542. NLG argues that the term "is effectively the same as 'look and feel description,'" and therefore lacks definiteness for the same reasons. Appellant's Br. 30 n.12.

Indefiniteness is a question of law we review *de novo*. *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1365–66 (Fed. Cir. 2011). The definiteness requirement is set forth in 35 U.S.C. § 112 ¶ 2, which states that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." The definiteness requirement focuses on whether "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). The inquiry "trains on the understanding of a skilled artisan at the time of the patent application." *Id.* at 2130.

When a claim term "depend[s] solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention," without sufficient guidance in the specification to provide objective direction to one of skill in the art, the term is indefinite. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) (finding "aesthetically pleasing" to be indefinite because the specification lacked any objective definition of the term). For some facially subjective terms, the definiteness requirement is not satisfied by merely offering examples that satisfy the term within the specification. *See Interval Licensing LLC v. AOL, Inc.*, 764 F.3d 1364, 1371–73 (Fed. Cir. 2014) (finding a single example of the term "unobtrusive manner" in the specification did not outline the claims to a skilled artisan with reasonable certainty). For other terms like, for example, terms of degree, specific and unequivocal examples may be sufficient to provide a skilled artisan with clear notice of what

is claimed. *See Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1334–35 (Fed. Cir. 2010) (finding the phrase "not interfering substantially" to be definite where intrinsic evidence provided multiple examples that would allow a skilled artisan to determine whether a particular chemical bond linkage group would "interfer[e] substantially" with hybridization).

Here, though NLG attempts to characterize "look and feel" as purely subjective, the evidence demonstrates that "look and feel" had an established, sufficiently objective meaning in the art, and that the '399 patent used the term consistent with that meaning. The specification explains that "the look and feel is captured by selecting an example page [from] the host, retrieving the sample page from the host, identifying the look and feel elements from the sample page and saving the identified look and feel elements." '399 patent, 13:5–9. "Look and feel elements" are described as "includ[ing] logos, colors, page layout, navigation systems, frames, 'mouse-over' effects, or other elements that are consistent through some or all of a Host's website." *Id.* at 13:9–12. DDR's expert on infringement testified that a skilled artisan would interpret these "other elements" as elements such as headers, footers, fonts, and images. J.A. 3584.

These examples are consistent with the established meaning of the term "look and feel" in the art, as demonstrated by Digital River's own evidence at trial. For example, as discussed in Section II. A., Digital River advertised its prior art SSS as generating composite web pages that displayed third-party merchandise but also replicated the "'look and feel' of the [host website's] identity." J.A. 6123. Digital River also explained that the composite web pages generated by its SSS "retain[ed] the look and feel of the [host's web]site." J.A. 6202. At trial, Digital River conceded that it understood the meaning of "look and feel." J.A. 4146–47 ("Q. And Digital River understood what it meant when it said: we'll match your

look and feel, right?  A.  Yes, sir."").  Digital River also admitted that its *customers* understood the meaning of "look and feel."  J.A. 4199 ("Q. . . . [S]omebody who is reading Digital River's [advertising] document should understand what Digital River means when it says matching look and feel, right? . . .  A.  Yes, sir.").

In sum, "look and feel" is not a facially subjective term like "unobtrusive manner" in *Interval* or "aesthetically pleasing" in *Datamize*.  Rather, as demonstrated by Digital River's own advertisements for its prior art SSS and its admissions at trial, the term had an established meaning in the art by the relevant timeframe.  The examples of "look and feel" elements disclosed in the specification are consistent with the term's established meaning.  In short, the term "visually perceptible elements," or "'look and feel' elements that can be seen," viewed in light of the specification and prosecution history, informed those skilled in the art about the scope of the '399 patent's claims with reasonable certainty.  The district court did not err by denying NLG's motion for JMOL of invalidity of the '399 patent under 35 U.S.C. § 112 ¶ 2.

## D. Infringement

NLG also contends that the district court erred by denying its motion for JMOL of noninfringement as to both the '572 and '399 patents.  Since the '572 patent is invalid under 35 U.S.C. § 102(a), we address only NLG's noninfringement appeal of the '399 patent.  We find, as did the district court, that the jury was presented with substantial evidence on which to base its finding that NLG infringes the asserted claims of the '399 patent.

NLG argues that the jury's finding that NLG's accused websites satisfy the "visually perceptible elements" limitation of the asserted claims is unsupported.  NLG further argues that DDR failed to introduce evidence that NLG's accused system automatically identifies or recognizes the source web page as required by claims 1 and 19

of the '399 patent. NLG also argues that DDR only showed the jury screenshot images of the accused websites running NLG's e-commerce system on a single day, and thus did not provide evidence of NLG's alleged infringement throughout the entire damages period.

The record tells a different tale. For the "visually perceptible elements" limitation, the jury viewed screenshot images from nine NLG-partner host websites and their corresponding accused NLG-operated composite web pages. DDR's expert on infringement also presented the jury with lists of the "look and feel elements" from each host website allegedly incorporated in a corresponding NLG-generated composite web page and opined that the accused composite web pages satisfied the limitation. The jury was free to use this proffered evidence and testimony to form its own conclusions as to whether NLG's accused composite web pages satisfied the "visually perceptible elements" limitation of the asserted claims.

As for the other contested limitations of the '399 patent's asserted claims, DDR's expert on infringement testified that on activation of a link on an NLG-partner host website corresponding to an NLG-generated composite web page, a keyword identifier is sent to NLG's e-commerce web server (*e.g.*, "OBWEB" for Orbitz's host website), and a processor therein determines the location and identity of the host website (*e.g.*, Orbitz). The jury was free to credit this testimony as evidence that NLG's accused e-commerce system "automatically . . . recogniz[es]" or "automatically identif[ies]" the source page "on which the link has been activated."

NLG's argument that DDR provided the jury with screenshot images of NLG's accused composite web pages—and thus evidence of infringement—for only one day appears to be more relevant to damages than to infringement. Regardless, NLG's contention is without merit. DDR's expert testified that he had examined NLG's

accused system throughout the entire period of alleged infringement, including any changes in its software source code, deposition testimony on its operation, and, via the Internet Archive, prior versions of accused composite web pages. Based on his review, DDR's expert testified that nothing about NLG's accused system "had changed in any substantial way" during this period. J.A. 3751–52. Substantial evidence supports the jury's finding that NLG's accused system infringes the '399 patent, and thus the district court did not err in denying NLG's motion for JMOL of noninfringement.

## E. Damages

DDR sought $6.04 million in damages for NLG's infringement of the '572 and '399 patents; NLG countered with $375,000. The parties agreed on a verdict form that instructed the jury to award a single sum to compensate DDR for NLG's infringement of the asserted claims found to be infringed and not invalid. J.A. 3080. The jury awarded DDR $750,000 in damages for NLG's infringement, without specifying how this award was apportioned between the '572 and the '399 patents.

Because we find the '572 patent invalid as anticipated, we vacate the damages award. This could warrant a new trial on damages. *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir. 2007). NLG did not, however, move for a new trial under FRCP 59 and may not have preserved its recourse to this option. *DDR Holdings*, 954 F. Supp. 2d at 522 ("Interestingly however, NLG does not move for a new trial pursuant to Rule 59."). We remand to the district court to determine the effect—if any—of our invalidation of the '572 patent on the jury's damages award.[8]

---

[8] We note that NLG's contention that the jury's damages award was "grossly excessive" because its ac-

F. Prejudgment Interest

The district court also awarded DDR prejudgment interest. NLG contends that DDR should not be entitled to any prejudgment interest because it is a non-practicing entity and at a minimum, DDR should not be entitled to any prejudgment interest during a four-year stay in litigation since the stay was the result of DDR's request for *ex parte* reexamination of the '135 and '572 patents.

We review the district court's award of prejudgment interest for an abuse of discretion. *See Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1377 (Fed. Cir. 2010); *see also Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983) ("[A] decision to award prejudgment interest will only be set aside if it constitutes an abuse of discretion."). Under 35 U.S.C. § 284, after a finding of infringement, the court *"shall award* . . . damages . . . together with *interest* and costs." (emphases added). Prejudgment interest should ordinarily be awarded absent some justification for withholding such an award. *Gen. Motors*, 461 U.S. at 657; *see also Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1358 (Fed. Cir. 2012) ("The award of pre-judgment interest is the rule, not the exception.") (quotation and citation omitted).

NLG cites no case law suggesting that prevailing non-practicing entities are *not* entitled to prejudgment interest. We decline to create such a statutory exception. *See Energy Transp.*, 697 F.3d at 1358 ("The district court did

cused websites infringed for only one day is based on a flawed premise and is without merit. As the district court explained, NLG cannot attempt to "reverse engineer the jury's math . . . and use its substituted, and purely speculative, analysis to call the award excessive." *DDR Holdings*, 954 F. Supp. 2d at 530.

not abuse its discretion in this case by following the standard rule of awarding pre-judgment interest."). However, since the '572 patent is invalid, the district court must recalculate its award of prejudgment interest so that it is tied solely to NLG's infringement of the '399 patent, which issued in 2010, more than four years after issuance of the '572 patent. *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 800 (Fed. Cir. 1988) ("Generally, prejudgment interest should be awarded from the date of infringement to the date of judgment."). Since the '399 patent did not issue until after the stay was lifted in 2010, we need not determine whether DDR is entitled to pre-judgment interest during the pendency of the contested stay.

We have considered the parties' remaining arguments and find them unpersuasive.

### III. CONCLUSION

In large part, we affirm the district court. The asserted claims of the '572 patent, however, are anticipated by Digital River's prior art Secure Sales System under 35 U.S.C. § 102(a), and no substantial evidence supports the jury's contrary finding. As such, the district court erred in denying defendants' motion for JMOL of invalidity as to the '572 patent. We vacate the award of damages and prejudgment interest to DDR based on NLG's infringement of the '572 and '399 patents and remand to the district court in order to determine the damages and prejudgment interest attributable solely to NLG's infringement of the '399 patent.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

---

**DDR HOLDINGS, LLC,**
*Plaintiff-Appellee,*

**v.**

**HOTELS.COM, L.P., CENDANT TRAVEL
DISTRIBUTION SERVICES GROUP, INC.,
EXPEDIA, INC., TRAVELOCITY.COM, L.P.,
SITE59.COM, LLC, INTERNATIONAL CRUISE &
EXCURSION GALLERY, INC.,
OURVACATIONSTORE, INC., INTERNETWORK
PUBLISHING CORPORATION, AND ORBITZ
WORLDWIDE, LLC,**
*Defendants,*

AND

**NATIONAL LEISURE GROUP, INC. AND
WORLD TRAVEL HOLDINGS, INC.,**
*Defendants-Appellants,*

AND

**DIGITAL RIVER, INC.,**
*Defendant.*

---

2013-1505

---

MAYER, *Circuit Judge*, dissenting.

I respectfully dissent. The claims asserted by DDR Holdings, LLC ("DDR") fall outside 35 U.S.C. § 101 because they simply describe an abstract concept—that an online merchant's sales can be increased if two web pages have the same "look and feel"—and apply that concept using a generic computer.

## I.

The common specification of DDR's patents notes that an online merchant will often lose customers when those customers click on an advertisement from a third-party vendor that has been displayed on the original merchant's web page. *See* U.S. Patent No. 6,993,572 (the "'572 patent") col.2 ll.30–33. The specification explains, however, that the original merchant could potentially avoid "the loss of hard-won visitor traffic," *id.* col.2 ll.64–65, if he were able to dupe customers into believing that they were still on the merchant's web page even when they were actually viewing goods from a third-party vendor, *id.* col.2 ll.26–65. Notably, though, DDR's patents are very vague as to how this duping is to occur, indicating only that the web page of the original merchant and that of the third-party vendor should be made to look alike using "visually perceptible elements." *See* U.S. Patent No. 7,818,399 (the "'399 patent") col.28 ll.31–32 (requiring the use of a "plurality of visually perceptible elements visually corresponding to the [original merchant's web] page"). DDR's patents fail to meet the demands of section 101 because they describe a goal—confusing consumers by making two web pages look alike—but disclose no new technology, or "inventive concept," *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012), for achieving that goal. *See O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 120 (1854) (rejecting a claim which covered "an effect produced by the use of electro-magnetism distinct from the process or machinery necessary to produce it"); *In re*

*Brooks*, 90 F.2d 106, 107–08 (CCPA 1937) ("It is for the discovery or invention of some practicable method or means of producing a beneficial result or effect, that a patent is granted, and *not for the result or effect itself.*" (emphasis added) (citations and internal quotation marks omitted)).

DDR's patents are long on obfuscation but short on substance.  Indeed, much of what they disclose is so rudimentary that it borders on the comical.  For example, the patents explain that two web pages are likely to look alike if they are the same color, have the same page layout, and display the same logos.  *See* '572 patent col.14 ll.5–18.  The recited computer limitations, moreover, are merely generic.  The claims describe use of a "data store," a "web page having a link," and a "computer processor," *id.* col.29 ll.1–13, all conventional elements long-used in e-commerce.  Because DDR's claims, like those at issue in *Alice Corporation v. CLS Bank International*, "simply instruct the practitioner to implement [an] abstract idea . . . on a generic computer," they do not meet section 101.  134 S. Ct. 2347, 2359 (2014); *see id.* at 2360 (rejecting claims requiring a "data processing system'" with a "communications controller" and a "data storage unit" as "purely functional and generic" (citations and internal quotation marks omitted)); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344 (Fed. Cir. 2013) (rejecting claims requiring "a combination of computer components including an insurance transaction database, a task library database, a client component, and a server component, which include[d] an event processor, a task engine, and a task assistant").

## II.

The court concludes that the asserted claims of DDR's '399 patent fall within section 101 because "they do not merely recite the performance of some business practice known from the pre-Internet world along with the

requirement to perform it on the Internet." *Ante* at 20. This is incorrect. DDR's claims do, in fact, simply take a well-known and widely-applied business practice and apply it using a generic computer and the Internet. The idea of having a "store within a store" was in widespread use well before the dawn of e-commerce. For example, National Leisure Group, Inc. ("NLG"), one of the defendants here, previously "sold vacations at . . . BJ's Wholesale Clubs through point of purchase displays in the 45 BJ's Clubs along the Eastern Seaboard." Br. of Defendants-Appellants National Leisure Group, Inc. and World Travel Holdings, Inc. at 4. DDR's patents are directed to the same concept. Just as visitors to BJ's Wholesale Clubs could purchase travel products from NLG without leaving the BJ's warehouse, the claimed system permits a person to purchase goods from a third-party vendor, but still have the visual "impression that she is viewing pages served by the [original host merchant]." '399 patent col.3 ll.23–24; *see ante* at 3 (explaining that DDR's claimed system "permits a website visitor, in a sense, to be in two places at the same time"). Indeed, any doubt as to whether the claimed system is merely an Internet iteration of an established business practice is laid to rest by the fact that one of the named inventors acknowledged that the innovative aspect of his claimed invention was "[t]aking something that worked in the real world and doing it on the Internet." J.A. 03208.

*Alice* articulated a technological arts test for patent eligibility. 134 S. Ct. at 2359 (explaining that the claimed method fell outside section 101 because it did not "improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field"). Here, the court correctly recognizes *Alice's* technological arts standard, but applies it in a deficient manner. According to the court, DDR's claims fall within section 101 because the "solution" they offer "is *necessarily rooted in computer technology* in order to overcome a problem

specifically arising in the realm of computer networks." *Ante* at 20 (emphasis added). The solution offered by DDR's claims, however, is not rooted in any new computer technology. Its patents address the problem of preventing online merchants from losing "hard-won visitor traffic," '572 patent col.2 ll.64–65, and the solution they offer is an entrepreneurial, rather than a technological, one. DDR has admitted that it did not invent any of the generic computer elements disclosed in its claims. J.A. 3311–16. There is no dispute, moreover, that at the time of the claimed invention the use of hyperlinks to divert consumers to particular web pages was a well-understood and widely-used technique. *See* '399 patent col.1 ll.29–52. While DDR's patents describe the potential advantages of making two web pages look alike, they do not disclose any non-conventional technology for capturing the "look and feel" of a host website or for giving two web pages a similar appearance. *See Alice*, 134 S. Ct. at 2360 ("[W]hat petitioner characterizes as specific hardware . . . is purely functional and generic."); *Accenture*, 728 F.3d at 1345 (rejecting claims that contained no "detailed software implementation guidelines"). DDR's patents fall outside section 101 because they simply "tak[e] existing information"—the visual appearance of a host merchant's website—and use conventional technology to "organiz[e] this information into a new form." *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014); *see Mayo*, 132 S. Ct. at 1298 (emphasizing that reciting "well-understood, routine, [or] conventional activity" does not impart patent eligibility).

In concluding that DDR's claims meet the demands of section 101, the court focuses on the fact that "they recite a *specific* way to automate the creation of a composite web page . . . ." *Ante* at 23 (emphasis added). The Supreme Court, however, has emphatically rejected the idea that claims become patent eligible simply because they disclose a specific solution to a particular problem. *See*

*Bilski v. Kappos*, 561 U.S. 593, 599–601 (2010) (concluding that claims fell outside section 101 notwithstanding the fact that they disclosed a very specific method of hedging against price increases); *Parker v. Flook*, 437 U.S. 584, 593 (1978) (rejecting the argument "that if a process application implements a principle in some specific fashion, it automatically falls within the patentable subject matter of § 101"). Indeed, although the claims at issue in *Alice* described a very specific method for conducting intermediated settlement, the Court nonetheless unanimously concluded that they fell outside section 101. 134 S. Ct. at 2358–60.

Nor is the fact that the claims address an "Internetcentric problem," *ante* at 23, sufficient to render them patent eligible. The Supreme Court has repeatedly made clear that "limiting the use of an abstract idea to a particular technological environment" is insufficient to confer patent eligibility. *Alice*, 134 S. Ct. at 2360 (citations and internal quotation marks omitted); *see also Mayo*, 132 S. Ct. at 1294; *Bilski*, 561 U.S. at 610. Accordingly, the fact that DDR's system operates "in the context of the Internet," *ante* at 22, does not bring it within patentable subject matter.

The potential scope of DDR's patents is staggering, arguably covering vast swaths of Internet commerce. DDR has already brought infringement actions against ten defendants, including Digital River, Inc., Expedia, Inc., Travelocity.com, L.P., and Orbitz Worldwide, LLC. *See* J.A. 255–63; *ante* at 7. DDR's claims are patent ineligible because their broad and sweeping reach is vastly disproportionate to their minimal technological disclosure. *See Mayo*, 132 S. Ct. at 1303 (In assessing patent eligibility, "the underlying functional concern . . . is a *relative* one: how much future innovation is foreclosed relative to the contribution of the inventor.").

*Alice* made clear that claims untethered to any advance in science or technology do not pass muster under section 101. 134 S. Ct. at 2359. Viewed as a whole, DDR's claims contain no more than an abstract idea for increasing sales implemented via "some unspecified, generic computer," *id.* at 2360. The inventive concept, if any, embedded in DDR's claims is an idea for "retaining control over the attention of the customer," *ante* at 22. Because this purported inventive concept is an entrepreneurial rather than a technological one, DDR's claims are not patentable.