WILLIAMSON

v.

**CITRIX ONLINE, LLC, et al.**

**CV 11–02409 SJO (JEMx)**

United States District Court, C.D. California.

Signed 02/17/2016

Timothy D. Byron, Geoffrey H. Yost, O'Melveny and Myers LLP, San Francisco, CA, Andrew B. McGill, Berine Marynard and Parsons LLP, Brian Thomas Bagley, Scott D. Marrs, William C. Norvell, Jr., Akerman LLP, Houston, TX, Brett J. Williamson, O'Melveny and Myers LLP, Newport Beach, CA, for Williamson.

Frank E. Scherkenbach, Kurt L. Glitzenstein, Fish and Richardson PC, Boston, MA, Indranil Mukerji, Fish and Richardson PC, Washington, DC, Jason W. Wolff, Fish and Richardson PC, Harold A. Barza, Jordan Brock Kaericher, Tigran Guledjian, Quinn Emanuel Urquhart and Sullivan LLP, Los Angeles, CA, Jonathan Joseph Lamberson, Fish and Richardson PC,

Redwood City, CA, Karolina Jesien, Fish and Richardson PC, Calvin Wingfield, Mark J. Abate, Goodwin Procter LLP, New York, NY, Sean S. Pak, Quinn Emmanuel Urquhart and Sullivan LLP, LLL Forrest Arthur Hainline, Goodwin Procter LLP, San Francisco, CA, Douglas M. Kubehl, Kurt M. Pankratz, Baker Botts LLP, Dallas, TX, Travis W. Thomas, Baker Botts LLP, Palo Alto, CA, Isabella E. Fu, Microsoft Corporation, Redmond, WA, Ronald B. Friedman, Adobe Systems Incorporated, San Jose, CA, for Citrix Online, LLC, et al.

**PROCEEDINGS (in chambers): ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF UNPATENTABILITY**
[Docket No. 524]

THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

This matter comes before the Court on Defendants/Counterclaimants WebEx Communications, Inc., Cisco WebEx LLC, and Cisco Systems, Inc. (together, "Cisco"), Citrix Online, LLC and Citrix Systems, Inc. (together, "Citrix"), and Microsoft Corp.'s ("Microsoft") (collectively, "Defendants") Motion for Summary Judgment of Unpatentability Under 35 U.S.C. § 101 ("Motion"), filed on October 20, 2015. Plaintiff Richard A. Williamson, on behalf of and as trustee for At Home Bondholders' Liquidating Trust ("Plaintiff") filed an opposition to the Motion ("Opposition") on November 10, 2015, to which Defendants replied ("Reply") on No-

vember 16, 2015. The Court found this matter suitable for disposition without oral argument and vacated the hearing set for December 7, 2015. *See* Fed. R. Civ. P. 78(b). For the reasons stated below, the Court **GRANTS** Defendants' Motion.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff brings suit against Defendants and other entities for infringement of U.S. Patent No. 6, 155, 840 (the "'840 Patent"). (*See generally* Compl., ECF No. 1.) Defendants [1] now move for summary judgment, arguing that the asserted claims of the '840 Patent embody abstract ideas implemented on generic computers, and as such, are invalid under 35 U.S.C. section 101 ("Section 101") and *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, —— U.S. ——, 134 S.Ct. 2347, 189 L.Ed.2d 296 (2014). (*See generally* Mot., ECF No. 524.) Plaintiff opposes the motion, arguing that the '840 Patent does not claim an abstract idea, and that even if it did, the claims include numerous limitations that transform the ideas into patent-eligible applications. (*See generally* Opp'n, ECF No. 528.)

### A. Factual Background and the '840 Patent

On March 22, 2011, Plaintiff filed a Complaint for Patent Infringement ("Complaint") against Defendants and a number of other entities alleging infringement of the '840 Patent, entitled "System And Method For Distributed Learning." (Defs.' Statement of Undisputed Facts and Conclusions of Law in Supp. Mot. ("DSUF") [2]

---

1. Defendants submit that the remaining defendants in this action do not oppose the requested relief. (*See* Mot.)

2. References to "DSUF" take into account Plaintiff's response to each allegedly undisputed fact. (*See* Pl.'s Statement of Disputed Facts in Opp'n to Defs.' Mot. ("PSDF"), ECF No. 528–2.) Unless otherwise indicated, a ref-

erence to "DSUF" indicates that the term is either undisputed by Plaintiff, or that the Court has found a fact to be undisputed after examining the evidence in the record. Although Plaintiff takes issue with two Exhibits submitted in connection with the Motion referencing websites that Defendants claim to be prior art, the Court does not rely on these exhibits in its opinion and therefore does not

¶ 1, ECF No. 524–2.) The '840 Patent was filed on September 18, 1998 and does not claim priority to any earlier-filed application. (DSUF ¶ 2.) Plaintiff alleges that Defendants infringe claims 1, 3–6, 17–18, and 20–23 of the '840 Patent.[3] (DSUF ¶ 3.) The two remaining independent claims of the '840 Patent—claims 1 and 17—read in their entirety:

1. A **method of conducting distributed learning** among a plurality of computer systems coupled to a network, the method comprising the steps of:
- providing instructions to a first computer system coupled to the network for:
  - creating a graphical display representative of a classroom;
  - creating a graphical display illustrating controls for selecting first and second data streams;
  - creating a first window for displaying the first selected data stream; and
  - creating a second window for displaying the second selected data stream, wherein
  - the first and second windows are displayed simultaneously; and
- providing instructions to a second computer system coupled to the network for:
  - creating a graphical display representative of the classroom;
  - creating a third window for displaying the first selected data stream; and
  - creating a fourth window for displaying the second selected data stream, wherein
  - the third and fourth windows are displayed simultaneously.

17. A **distributed learning server** for controlling a presenter computer system and an audience member computer system coupled to the distributed learning server via a network, the distributed learning server comprising:
- a **module for providing a first graphical display** on the presenter computer system, the first graphical display comprising:
  - a first presenter content selection control for selecting a first source of streaming content representative of graphical information;
  - a first presenter content display region for displaying the graphical information represented by the streaming content from the first selected source;
  - a second presenter content selection control for selecting a second source of streaming content representative of graphical information; and
  - a second presenter content display region for displaying the graphical information represented by the streaming content from the second selected source, wherein the first and second presenter content display regions are adapted to display simultaneously; and
  - a classroom region for representing the audience member computer system coupled to the distributed learning server; and

rule on these objections. (*See generally* Pl.'s Evidentiary Objections in Opp'n to Mot., ECF No. 528–3.)

**3.** Plaintiff had previously asserted additional claims against the named defendants in this action. Independent claim 8 and dependent claims 9 through 16, however, were ruled invalid due to indefiniteness after claim construction was held. (*See* Claim Construction Order ("Markman Order"), ECF No. 353.) The Federal Circuit upheld this finding of indefiniteness. *See Williamson v. Citrix Online, LLC, et al.*, 792 F.3d 1339 (Fed. Cir. 2015)

- a **module for providing a second graphical display** on the audience member computer system, the second graphical display comprising:

  - a first audience member content display region for displaying the graphical information represented by the streaming content from the first source selected by the content selection control; and
  - a second audience member content display region for displaying the graphical information represented by the streaming content from the second source selected by the content selection control, wherein the first and second audience member content display regions are adapted to display simultaneously.

('840 Patent col. 10:28–14:14 [emphases added].)

The abstract of the '840 Patent states that "[t]he presenter and audience computer systems are preferably industry-standard computer systems executing JAVA-compatible web browsers connected to the distributed learning server." (DSUF ¶ 4.) The specification of the '840 Patent states that "[c]onventional training methods include providing manuals and/or classroom instruction." (DSUF ¶ 5.) The '840 Patent also states in the specification that

> [t]o solve the problem of bringing people together, complex technologies have been developed to facilitate distributed learning. One such technology uses satellite broadcasts or other closed-circuit links to provide two-way video and audio communication between a teacher at a broadcast center with audience members at one or more remote classrooms. However, this solution is less than ideal because it requires specialized hardware to be present at the teacher's location and at each classroom. Other solutions use specialized software programs executing on computer systems in an attempt to simulate the classroom experience. Since the software is specialized, each audience member must have access to the software and a network connection before connecting to the "classroom." This software is often expensive, resulting in a high cost to the audience member. In addition, the software may introduce compatibility and support problems.

(DSUF ¶ 6.)

Plaintiff's expert witness, Dr. Shukri Souri ("Dr. Souri") has stated under oath that "[s]uch challenges, among others described in the '840 Patent, are addressed by using a distributed learning system that provides the benefits of classroom interaction and that can use industry-standard computer hardware and software linked by a computer network, such as the 'Internet.'" (DSUF ¶ 16.) Dr. Souri has also explained that "it's well-known that there are industry standards governing the operation, the browsing of the worldwide web," including JAVA. (DSUF ¶ 17.)

B. Procedural History

On September 4, 2012, United States District Court Judge A. Howard Matz ("Judge Matz") issued a Claim Construction Order in which Judge Matz construed eleven terms of the '840 Patent. (Markman Order.) In relevant part, Judge Matz held that (1) the "distributed learning control module" limitation in claim 8 is a means-plus-function claim limitation lacking a structure corresponding to the "coordinating" step and is therefore indefinite; (2) the term "graphical display representative of a classroom" in claim 1 means "a pictorial map illustrating an at least partially virtual space in which participants can interact, and that identifies the presenter(s) and the audience member(s) by their locations on the map; and (3) the term "first graphical display comprising ... a classroom region" in claim 17 means "first

graphical display comprising: ... a display region for a pictorial map illustrating an at least partially virtual space in which participants can interact, and that identifies the presenter(s) and the audience member(s) by their locations on the map." (*See* Markman Order.)

After Judge Matz issued the Markman Order and denied parties Plaintiff's Motion for Reconsideration, the parties stipulated to final judgment and Judge Matz entered a Stipulated Final Judgment. (Order Den. Mot. for Recons., ECF No. 475; Stipulated Final J., ECF No. 477.) The Stipulated Final Judgment was then appealed to the Court of Appeals for the Federal Circuit, and on June 16, 2015 the Federal Circuit issued its opinion in *Williamson v. Citrix Online, LLC et al.*, 792 F.3d 1339 (Fed. Cir. 2015). (*See* Notice of App., ECF No. 480; Opinion from Federal Circuit Court of Appeals, ECF No. 484.). In the Federal Circuit opinion, the Federal Circuit affirmed Judge Matz's finding that the "distributed learning control module" limitation of claim 8 was a means-plus-function claim lacking sufficient structure to be enabled. *Williamson*, 792 F.3d at 1347–54. The Federal Circuit reversed Judge Matz's finding that the "graphical display" limitations should be construed to require a "pictorial map," and held that the "graphical display" limitations in claims 1 and 17 are properly construed as "a graphical representation of an at least partially virtual space in which participants can interact." *Id.* at 1347.

On July 28, 2015, the remanded action was reassigned from Judge Matz to Judge Stephen V. Wilson, (ECF No. 486), and on August 3, 2015, Judge Wilson transferred the action to the patent pilot program, from which the action was assigned to this Court. (ECF No. 492.)

## II. DISCUSSION

In the Motion, Defendants argue that each of the asserted claims of the '840 Patent is not patent-eligible under 35 U.S.C. section 101 ("Section 101") because the claims "merely apply the abstract idea of using a classroom as an interactive teaching environment to 'industry-standard' computers connected via a network to create a 'partially virtual' 'classroom.'" (Mot. 1.) Plaintiff responds that the '840 Patent is not directed to the abstract idea of using a classroom but is instead directed to the idea of distributed learning, and that Defendants have not met their burden of pointing to undisputed evidence showing that the asserted claims do not contain sufficient additional elements to transform the nature of the abstract idea. (*See generally* Opp'n.) Defendants respond that Plaintiff's own characterization of the '840 Patent supports a finding that the '840 Patent is directed to the abstract idea of creating a virtual classroom, and that Plaintiff has failed to identify an "inventive concept" that renders the asserted claims patent-eligible. (*See generally* Reply.)

### A. Summary Judgment Standard

Patent-eligibility under Section 101 is a question of law. *OIP Techs., Inc. v. Amazon.com*, Inc., 788 F.3d 1359, 1362 (Fed. Cir. 2015). The Court may appropriately decide the issue of patent-eligibility at the summary judgment stage. *See Planet Bingo, LLC v. VKGS LLC*, 576 Fed. Appx. 1005, 1007 (Fed. Cir. 2014); *IPLearn–Focus, LLC v. Microsoft Corp.*, No. 14-cv-00151-JD, 2015 WL 4192092, at *3 (N.D. Cal. July 10, 2015).

Issued patents. are presumed valid, and although the appropriateness of attaching a presumption of validity to a patent subject to a Section 101 challenge has been questioned, *see Ultramercial, Inc. v. Hulu, LLC ("Ultramercial II")*, 772 F.3d

709, 720–21 (Fed. Cir. 2014) (Mayer, J., concurring) (arguing that "applying a presumption of eligibility is particularly unwarranted given that the expansionist approach to section 101 is predicated upon [the PTO's] misapprehension of the legislative history of the 1952 Patent Act"), both the Federal Circuit and courts in this district attach a presumption of validity to issued patents and require defendants to prove patent-ineligibility by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 131 S.Ct. 2238, 2242, 180 L.Ed.2d 131 (2011); *see also Ultramercial, Inc. v. Hulu, LLC ("Ultramercial I")*, 722 F.3d 1335, 1342 (Fed. Cir. 2013), *vacated & remanded on other grounds by WildTangent, Inc. v. Ultramercial, LLC*, —— U.S. ——, 134 S.Ct. 2870, 189 L.Ed.2d 828 (2014) (mem.) (holding that the clear and convincing evidentiary standard applies to Section 101 challenges); *CMG Fin. Servs., Inc. v. Pac. Trust Bank, F.S.B.*, 50 F.Supp.3d 1306, 1314 (C.D. Cal. 2014) (citation omitted) (applying clear and convincing evidence standard to Section 101 challenge). "Although an exact definition is elusive, 'clear and convincing evidence' has been described as evidence that 'place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable.'" *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 n.5 (Fed. Cir. 2007) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984)).

Once the moving party meets its burden, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by [the] depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505. "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

### B.   Section 101 Analytical Framework

"Section 101 defines the subject matter that may be patented under the Patent Act." *Bilski v. Kappos*, 561 U.S. 593, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010). Section 101 reads in its entirety: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. "Section 101 thus specifies four independent categories of inventions or discoveries that are eligible for patent protection: processes, machines, manufactures, and compositions of matter." *Bilski*, 561 U.S. at 601, 130 S.Ct. 3218.

Although acknowledging that "[i]n choosing such expansive terms ... Congress plainly contemplated that the patent laws would be given wide scope," the Supreme Court long ago identified three exceptions to Section 101: "laws of nature, physical phenomena, and abstract ideas." *Diamond*

*v. Chakrabarty*, 447 U.S. 303, 308–09, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980). Although these exceptions are not required by the statutory text, they are consistent with the idea that certain discoveries "are part of the storehouse of knowledge of all men" and are "free to all men and reserved exclusively to none." *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948). Thus, "the concern that drives this exclusionary principle [is] one of pre-emption." *Alice*, 134 S.Ct. at 2354 (citation omitted). Consequently, the Supreme Court has required that "[i]f there is to be invention from such a discovery, it must come from the application of the law of nature to a new and useful end." *Funk Bros.*, 333 U.S. at 130, 68 S.Ct. 440. These principles have been held to apply with equal force to product and process claims. *Gottschalk v. Benson*, 409 U.S. 63, 67–68, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972).

*Alice Corp. v. CLS Bank* ("*Alice*") represents the Supreme Court's latest attempt to clarify how courts should apply these difficult principles. In *Alice*, the Supreme Court expanded on the two-step approach for resolving Section 101 issues first articulated in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 132 S.Ct. 1289, 1296–97, 182 L.Ed.2d 321 (2012). First, a court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice*, 134 S.Ct. at 2355 (citing *Mayo*, 132 S.Ct. at 1296–97). If so, then the court must ask "[w]hat else is there in the claims," which requires consideration of "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (citing *Mayo*, 132 S.Ct. at 1297–98). In this second step, the court must "search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient

to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.' " *Id.* (citing *Mayo*, 132 S.Ct. at 1294). This two-step analytical framework has been labeled the "*Alice/Mayo* test."

Identifying whether a claim is "directed to an abstract idea" under step one of the *Alice/Mayo* test is not always a simple undertaking. Although there is some disagreement among courts as to how expansively a claim should be examined at *Alice/Mayo* step one, courts have found it helpful to examine the purpose of a challenged claim to determine whether it is directed to an abstract idea. *See Cal. Inst. Tech. v. Hughes Commc'ns, Inc.*, 59 F.Supp.3d 974, 991–92 (C.D. Cal. 2014) (requiring that a court "identify the purpose of the claim—in other words, what the claimed invention is trying to achieve—and ask whether that purpose is abstract," making the *Alice/Mayo* step 1 "a sort of 'quick look' test, the object of which is to identify a risk of preemption and ineligibility"); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258–59 (Fed. Cir. 2014) (although blurring steps one and two in analyzing internet-based patent claims, finding the claims not patent-ineligible where they "specify how interaction with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of the hyperlink"). Finally, although the Supreme Court in *Alice* identified three categories of ideas that the Court had previously found to be "abstract"—mathematical principles, fundamental economic practices, and longstanding commercial practices—the Court did not hold that a claim can only be directed to an abstract idea if it falls within one of these categories. *See generally Alice*, 134 S.Ct. at 2354–57.

If the claim is directed to an abstract idea, the Court must determine whether the specific claim elements, considered both individually and "as an ordered combination," "transform the nature of the claim" into a patent-eligible invention. *Alice*, 134 S.Ct. at 2355 (quoting *Mayo*, 132 S.Ct. at 1297). In *Alice*, the Supreme Court considered whether "[t]he introduction of a computer into the claims" directed toward the abstract idea of intermediated settlement was sufficient to "transform the nature of the claim" by adding an "inventive concept." *Id.* at 2357. The Supreme Court held that it did not, and made clear that "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 2358. "Nor is limiting the use of an abstract idea 'to a particular technological environment'" sufficient to impart patent-eligibility. *Id.* (quoting *Bilski*, 561 U.S. at 610–11, 130 S.Ct. 3218). In its discussion, the Supreme Court in *Alice* distinguished an earlier case, *Diamond v. Diehr*, in which the Court held that a computer-implemented process for curing rubber, which employed a "well-known" mathematical equation, was nevertheless patent-eligible because it used that equation in a process designed to solve a technological problem in "conventional industry practice." [4] *Alice*, 134 S.Ct. at 2358 (citing *Diamond v. Diehr*, 450 U.S. 175, 177–78, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981)).

The Court of Appeals for the Federal Circuit has had occasion to grapple with Section 101 issues in the wake of *Alice*. These cases appear to distinguish between patents claiming improvements to modern technology and those claiming well-known concepts untethered to any particular technology or technological environment. *Compare DDR Holdings*, 773 F.3d at 1258–59

(finding eligible under Section 101 a patent claiming a method for retaining visitors on a website through the creation of a digital "store within a store," both because "the claims recite an invention that is not merely the routine or conventional use of the Internet," and also because the claims "do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same," but rather claim an "inventive concept for resolving [a] particular internet-centric problem"), *with Ultramercial II*, 772 F.3d at 715–16 (Fed. Cir. 2014) (finding patent-ineligible claims involving the display of an advertisement in exchange for access to copyrighted media, where the limitations "simply instruct the practitioner to implement the abstract idea with routine, conventional activity" and where the "invocation of the Internet also adds no inventive concept"), *cert. denied*, —— U.S. ——, 135 S.Ct. 2907, 192 L.Ed.2d 929 (2015); *Planet Bingo*, 576 Fed.Appx. at 1008–09 (finding patent-ineligible claims reciting methods and systems for "managing a game of Bingo" where the claimed computer elements—"a computer with a central processing unit," "a memory," "an input and output terminal," "a printer," possibly "a video screen," and a "program ... enabling the steps of managing a game of bingo" perform steps of selecting, storing, and retrieving two sets of numbers, assigning a player identifier and a control number, and comparing a winning set of bingo numbers with a selected set of bingo numbers—simply recite a generic computer implementation of the covered abstract idea). Notwithstanding the difficulties inherent in applying Section 101, at least one relatively settled rule has emerged: claims that "improve the functioning of the computer itself" or "effect an improvement in

---

**4.** In particular, the Supreme Court in *Diehr* explained that the claimed contribution to the art was the step of "constantly measuring the

actual temperature inside a rubber molding press" used to create synthetic rubber products. *Diehr*, 450 U.S. at 206, 101 S.Ct. 1048.

any other technology or technological field" may provide an inventive concept sufficient to overcome the risk of preemption inherent in claiming an abstract idea. *Alice*, 134 S.Ct. at 2359 (citations omitted).

### C. Analysis

#### 1. Representativeness of Claim 1

■ Before addressing *Alice/Mayo* step one, the Court notes that the parties do not dispute whether claim 1 is "representative" for the purpose of conducting a Section 101 analysis. (*See* Mot. 3; Opp'n.) "When a dependent claim and the independent claim it incorporates are not separately argued, precedent guides that absent some effort at distinction, the claims rise or fall together." *Soverain Software LLC v. Newegg Inc.*, 728 F.3d 1332, 1335 (Fed. Cir. 2013) (citations omitted). The Court nevertheless finds claim 1 sufficiently similar to claim 17 and the remaining dependent claims to warrant treating claim 1 as "representative" for the purpose of the instant Motion; notwithstanding the above, however, the Court, where appropriate, conducts a Section 101 analysis for both remaining independent claims and their dependent claims.

#### 2. Step 1: Whether the Claims are Directed to Patent–Ineligible Abstract Ideas

■ The first step in determining whether a claim satisfies Section 101 is determining whether the claim is directed to a "patent-ineligible concept" such as an abstract idea. *Alice*, 134 S.Ct. at 2355. Defendants argue the alleged invention claimed in the '840 Patent is "an application of the abstract idea of using a classroom as an interactive teaching environment," pointing to the recitation of a "classroom metaphor" having attributes indistinguishable from traditional brick-and-mortar classrooms in the preferred embodiment. (Mot. 6.) In support of this position, Defendants note that in one em-

bodiment, the presenter is located on a virtual "podium" in front of the room, with audience members located in virtual "rows of seats" facing the presenter. (Mot. 6 [citing '840 Patent at Abstract, col. 6:4–9, Figure 6].) Defendants also point to the '840 Patent's acknowledgment that the "classroom metaphor" adheres closely to customary classroom principles, stating that the invention's "distributed learning experience ... allows remotely located presenters and audience members to engage in a traditional classroom discussion," and noting that "[s]kills and behaviors learned by the participants in other learning environments, including real classrooms, are immediately applicable to the environment provided by the system." (Mot. 6 [citing '840 Patent col. 10:13–19].)

Plaintiff responds that the '840 Patent is "not directed to the abstract idea of a classroom," but instead claims "specific methods and systems of distributed learning—an instructional model that allows instructors, students, and content to exist in different physical locations so that instruction and learning can occur independent of place and time." (Opp'n 5, 8.) In support of this characterization, Plaintiff points to statements made by Defendants and their experts describing the '840 Patent as "a system and method for distributed learning" separate and apart from any mention of a "classroom." (*See* Opp'n 7–8.)

■ Here, the Court agrees that Defendants' position, which relies on evidence intrinsic to the '840 Patent, better characterizes the nature of the asserted claims, and accordingly finds that the claims are directed to the abstract concept of creating a **virtual, interactive learning environment**. In support of this finding, the Court first notes that the specification of the '840 Patent describes the invention as "pertain[ing] in general to **teaching and collaborative learning** and in particular to a

method and system for providing distributed skill-based training through the use of multiple streaming video feeds and data sharing over a network such as the Internet." ('840 Patent col. 1:7–11 [emphasis added].) The specification of the '840 Patent similarly describes the invention as a "distributed learning system that uses industry-standard computer hardware and software linked by a network like the Internet to provide a **classroom- or auditorium-like metaphor** to at least one presenter and at least one audience member." (DSUF ¶7 [emphasis added].) Because claims "must be read in view of the specification, of which they are a part," the Court considers these descriptions of the invention claimed in the '840 Patent instructive. *IPLearn–Focus*, 2015 WL 4192092, at *4 (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc)).

Separate and apart from the specification, a review of the remaining independent claims reveals that they are directed to the concept of creating a virtual, interactive learning environment. Claim 1, for example, recites a "method of conducting distributed learning" and further requires (1) the creation of a "graphical display representative of a classroom," which the Federal Circuit has construed to mean "a graphical representation of an at least **partially virtual space** in which **participants can interact**," *Williamson*, 792 F.3d at 1347 (emphasis added); and (2) the creation of windows for displaying data streams on two different computer systems that are "displayed **simultaneously.**" ('840 Patent col. 10:28–52.) Claim 17 similarly recites a "distributed learning server" comprising two different modules for providing "graphical display[s]" on presenter and audience member computer systems that contain "content display regions" which are "adapted to display simultaneously." ('840 Patent col. 12:29–65.) The graphical display on the presenter computer system also contains a "classroom region" for representing the audience member computer system. ('840 Patent col. 12:50–53.) There can be no dispute that the purpose of these claims is to create a virtual environment that permits multiple users to view content and interact simultaneously. Tellingly, Plaintiff and its expert's own characterization of the purported benefit of the invention claimed in the '840 Patent confirms this understanding of the nature of the asserted claims. In its Opposition, Plaintiff states that "[t]he claimed simultaneous display of two data streams, coupled with the graphical classroom display and the presenter's controls for selecting two data streams, provides a critical benefit over prior art distributed learning systems: **natural, two-way teacher-student-classroom interactivity.**" (Opp'n 7 [emphasis added] [citing Decl. of Dr. Shukri J. Souri in Supp. Opp'n ("Souri Decl."), ECF No. 528, Ex. 7 at ¶¶ 12–14, 21].) Because *Alice/Mayo* step 1 requires the court to "identify the purpose of the claim—in other words, what the claimed invention is trying to achieve—and ask whether that purpose is abstract," the Court finds there to be clear and convincing evidence that the asserted claims are directed to the idea of providing a virtual, interactive learning environment. *See Cal. Inst. Tech.*, 59 F.Supp.3d at 991.

Moreover, the Court disagrees with Plaintiff's contention that the idea underlying the asserted claims is not "abstract" as the term is understood in the context of Section 101 jurisprudence. First, though the Supreme Court in *Alice* addressed several categories of subject matter found to be patent-ineligible in its prior cases, *Alice* did not hold, much less suggest, that **only** claims directed to one of these categories could be found patent-ineligible under Section 101. *See generally Alice*, 134 S.Ct. at 2354–57; *see also Appistry, Inc. v. Amazon.com, Inc., et al.*, No. 15-cv-00311-MJP, 2015 WL 4210890, at *2 (W.D. Wash. July

9, 2015) ("Appistry's attempt to attach talismanic significance to the mathematical algorithm, fundamental economic practice, and longstanding commercial practice categories, however, has already been rejected by the Supreme Court, which explained in *Alice* that the operative question is whether or not the patent claims are directed toward an abstract idea, and **not** whether or not the invention could be classified into one of Plaintiff's three categories.") (emphasis in original). Indeed, Plaintiff's argument here is the same as the one raised by the patentee and rejected by the Federal Circuit in *Ultramercial II*. The representative claim at issue in *Ultramercial II* includes eleven steps for displaying an advertisement in exchange for access to copyrighted media. *Ultramercial II*, 772 F.3d at 714–15. The patentee argued that the asserted claims "are not directed to the type of abstract idea at issue in *Alice* zone [sic] that was 'routine,' 'long prevalent,' or 'conventional'—and are, instead, directed to a specific method of advertising and content distribution that was previously unknown and never employed on the Internet before." *Id.* at 714. The Federal Circuit rejected Plaintiff's characterization and found that the asserted claims "describe[ ] only the abstract idea of showing an advertisement before delivering free content." *Id.* at 715. In so holding, the Federal Circuit expressly disagreed with the patentee's argument "that the addition of merely novel or non-routine components to the claimed idea necessarily turns an abstraction into something concrete," finding that "any novelty in implementation of the idea is a factor to be considered only in the second step of the *Alice* analysis." *Id.* Even if *Alice* could be construed as holding that a claim can only be found patent-ineligible if it falls into a category previously held ineligible ·by the Supreme Court, the Court nevertheless finds that the concept of providing a virtual, interactive learning environment can readily be categorized as a "method of organizing human activity," which falls "squarely within the realm of 'abstract ideas' as [the Supreme Court] ha[s] used that term." *See Alice*, 134 S.Ct. at 2356–57.

Plaintiff's argument that the idea of "real time, interactive distance learning" claimed in the '840 Patent "necessarily requires a technology solution" is similarly beside the point, for the fact that a method can only be performed using a computer does not necessarily render Section 101 inapplicable. *Alice* itself instructs that "[t]he fact that a computer necessarily exist[s] in the physical, rather than purely conceptual, realm ... is beside the point" because such a rule would "make the determination of patent eligibility depend simply on the draftsman's art, thereby eviscerating" Section 101's exemptions. *Alice*, 134 S.Ct. at 2358–59 (internal quotation marks and citations omitted); *see also Appistry*, 2015 WL 4210890, at *2 ("That the inventions describe this idea as implemented by computers or as existing solely in the computing realm, and thus that the inventions have no pre-computing analogues, does not 'take[ ] the claims outside the realm of the abstract,' as Appistry contends.... Rather, it highlights the fact that the patents claim an abstract idea implemented in a particular technological environment: a 'fabric' of inexpensive networked computers.").

In summation, the Court is left with an "abiding conviction" that the claims of the '840 Patent are directed to the abstract idea of creating a virtual, interactive learning environment. *Cf. Pfizer*, 480 F.3d at 1359.

3. Step 2: Whether Claims 1 and 17 Include an "Inventive Concept" Sufficient to "Transform the Nature of the Claims" into Patentable Inventions

Having determined that claims 1 and 17 of·the '840 Patent are directed to

the abstract idea of creating a virtual, interactive learning environment, the Court now "examine[s] the limitations of the claims to determine whether the claims contain an 'inventive concept' to 'transform' the claimed abstract idea into patent-eligible subject matter." *Ultramercial II*, 772 F.3d at 715 (quoting *Alice*, 134 S.Ct. at 2357). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Alice*, 134 S.Ct. at 2357 (quoting *Mayo*, 132 S.Ct. at 1297) (alterations in original). "Those 'additional features' must be more than 'well-understood, routine, conventional activity.'" *Ultramercial II*, 772 F.3d at 715 (quoting *Mayo*, 132 S.Ct. at 1298). The "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S.Ct. at 2358.

Defendants contend that the claim elements, when viewed individually and as an "ordered combination," lack an inventive concept sufficient to make the asserted claims patent-eligible, as "the entire purported invention was the use of 'industry-standard computer systems' to implement the abstract idea of a virtual 'classroom.'" (Mot. 9.) Plaintiff responds by noting that when the '840 Patent was filed in 1998, it was neither generic nor conventional for distributed learning systems to utilize general purpose computers, utilize a network, permit natural, two-way student-teacher interaction, utilize two data streams, or employ a graphical classroom display. (Opp'n 13.) Plaintiff also argues that because the asserted claims fail the "mental steps" and "pen and paper" tests and satisfy the "machine-or-transformation test," they should be found patent-eligible. (Opp'n 14–15.)

The Court concludes that the asserted claims lack sufficient "additional features" to transform the abstract idea of creating a virtual, interactive learning environment into a patent-eligible invention. The majority of the steps of the asserted claims comprise the abstract concept of creating a virtual environment wherein participants can interact in real time. "Adding routine additional steps" such as providing instructions to first and second networked computer systems and creating graphical displays and windows on said computer systems "does not transform an otherwise abstract idea into patent-eligible subject matter." *Ultramercial II*, 772 F.3d at 716. No meaningful limitations are placed on the hardware or software required to be used in the claimed methods or systems. In particular, the asserted claims themselves do not contain any limitations regarding specific hardware or software, and the specification provides that the claimed distributed learning system "uses industry-standard computer hardware and software linked by a network like the Internet...." (DSUF ¶ 7 [quoting '840 Patent col. 2:10–13].) Indeed, the preferred embodiment of the invention uses "industry-standard personal computer systems capable of browsing the World Wide Web on the Internet, executing JAVA instructions, and receiving data from the distributed learning server." (DSUF ¶ 10 [quoting '840 Patent col. 2:59–63].) "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Alice*, 134 S.Ct. at 2358 (quoting *Mayo*, 132 S.Ct. at 1297). "The claims' invocation of [a network such as the] Internet also adds no inventive concept." *Ultramercial II*, 772 F.3d at 716. Nor does recitation of a "data stream" or "streaming content" add an inventive concept, as streaming is a "routine and generic processing and storing

capabilit[y] of computers generally." *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 109 F.Supp.3d 916, 938–40 (W.D. Tex. 2015). Finally, the recitation of limitations such as a "graphical display representative of a classroom" cannot save the asserted claims, as these limitations embody the abstract concept to which the claims are directed and do not specify how the graphical display is to be generated. Accordingly, none of the limitations, when viewed individually, provide an "inventive concept" sufficient to confer patent-eligibility under Section 101.

Although there is no dispute that the '840 Patent acknowledges that computers had previously been used to create virtual, interactive learning environments, (*see* DSUF ¶ 6 ["complex technologies have been developed to facilitate distributed learning" including the "use[ ] of satellite broadcasts or other closed-circuit links" and the "use [of] specialized software programs executed on a computer system in an attempt to simulate the classroom experience"] ), Plaintiff disputes by way of a declaration submitted by its expert whether a number of individual claim limitations were "conventional" in the field of distributed learning in 1998, the year the application leading to the '840 Patent was filed. (*See* Opp'n 18–19.) Plaintiff's reliance on evidence tending to show that certain individual hardware and software elements, including the use of general-purpose computers and streaming, may not have been regularly employed by those in a particular field at the time the patent was filed is both misplaced and specifically foreclosed by *Ultramercial II*: "That some of the eleven steps were not previously employed in this art is not enough—standing alone—to confer patent eligibility upon the claims at issue." *Ultramercial II*, 772 F.3d at 716.

Whether the individual elements, when viewed as an "ordered combination," transform the nature of the asserted claims into patent-eligible subject matter presents a more difficult question that requires a careful examination of recent case law. Plaintiff argues that a finding of patent-ineligibility under Section 101 "requires that the **combination** of limitations be generic and conventional," and that Defendants have failed to meet their burden of proving that the claim elements, when viewed as an ordered combination, are both generic and conventional. (Opp'n 17 [emphasis in original].) Defendants respond that the claims, which neither purport to improve the functioning of the computer itself nor recite any specific limitation or improvement of computer technology, thus "amount to 'nothing significantly more' than an instruction to take the pre-Internet world abstract idea of creating a virtual classroom, and perform it on the Internet using standard computers and software." (Reply 6.)

To the extent Plaintiff's argument centers on evidence (or a lack of evidence pointed to by Defendants) that the use of industry-standard computer hardware and software in the field of distributed learning as it existed in 1998 was novel and unconventional, the Court declines the opportunity to interpret Section 101 in a manner that obviates the independent patentability requirement of "novelty" codified at 35 U.S.C. section 102. Both parties' apparent fascination with the issue of "novelty" in the Section 101 context was addressed in a recent decision by another court in this district:

> Defendants argue that "[a]s in the *Alice Corp.* decision and its progeny, there is nothing novel or otherwise patentable about the Asserted Claims." (Mot. 5.) This statement, focusing on novelty, is perhaps an odd opening for a patentable subject matter attack. It likely results from the Supreme Court's emphasis in *Alice* and *Bilski* that the abstract idea at issue in each of those cases was "a fun-

damental economic practice long prevalent in our system of commerce." *Alice*, 134 S.Ct. at 2356; *Bilski*, 561 U.S. at 611, 130 S.Ct. 3218. When the Court emphasizes how long something has been around, readers' minds naturally drift to the requirements of novelty and non-obviousness found in 35 U.S.C. §§ 102 and 103.

In fact, given (1) that the idea in *Alice* was old, and (2) "the ubiquity of computers," *Alice*, 134 S.Ct. at 2358, it seems that *Alice* could have been decided the same way under § 103. But where the abstract idea at the heart of the claim is new, the Supreme Court's exceptions to § 101's otherwise sweeping coverage— "anything under the sun that is made by man," *Diamond v. Chakrabarty*, 447 U.S. 303, 309, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980)—are much more important constraints. In the case of a new abstract idea (or newly discovered law of nature or physical phenomenon) the exceptions to § 101 aren't just hammering a nail with a shoe. They are tools uniquely capable of preventing or invalidating a patent that otherwise passes §§ 102 and 103.

But the Supreme Court has not reserved § 101 for when §§ 102 and 103 fail. Thus, Defendants are justified in calling for a § 101 determination in this case. And here, the § 101 shoe fits. . . .

*Mortgage Grader, Inc. v. Costco Wholesale Corp.*, 89 F.Supp.3d 1055, 1061 (C.D. Cal. 2015); *see also IpLearn, LLC v. K12 Inc.*, 76 F.Supp.3d 525, 534 (D. Del. 2014) ("A new idea, i.e., one that is non-anticipated and non-obvious, does not, however, make an abstract idea patent eligible."). Thus, even if the invention claimed in the '840 Patent was both novel and non-obvious— both issues that have yet to be determined in this case—such findings would not necessarily render the asserted claims patent-eligible under Section 101.

Relatedly, that an inventor may have been prescient enough to be the first to claim the use of a computer to implement an abstract idea does not render the invention patent-eligible. As noted by Judge Mayer in his concurrence in *Ultramercial II*, "[t]he fact that the asserted claims 'require a substantial and meaningful role for the computer' is insufficient to satisfy the technological arts test," not because "generic computers and the Internet are not 'technology,' but instead that they have become indispensable staples of contemporary life." *Ultramercial II*, 722 F.3d at 722–23 (Mayer, J., concurring) (quoting *Alice*, 134 S.Ct. at 2359). Because computers "are the basic tools of modern-day commercial and social interaction, their use should in general remain 'free to all men and reserved exclusively to none.'" *Id.* at 723 (quoting *Funk Bros.*, 333 U.S. at 130, 68 S.Ct. 440). The Supreme Court's analysis of the patent-eligibility of a patent claiming the use of electromagnetism as a writing tool in *O'Reilly v. Morse* is similarly illuminating:

Again, the use of steam as a motive power in printing-presses is comparatively a modern discovery. Was the first inventor of a machine or process of this kind entitled to a patent, giving him the exclusive right to use steam as a motive power, however developed, for the purpose of marking or printing intelligible characters? Could he have prevented the use of any other press subsequently invented where steam was used? Yet so far as patentable rights are concerned both improvements must stand on the same principles. Both use a known motive power to print intelligible marks or letters; and it can make no difference in their legal rights under the patent laws, whether the printing is done near at hand or at a distance. Both depend for success not merely upon the motive power, but upon the machinery with which it is combined. And it has never,

we believe, been supposed by any one, that the first inventor of a steam printing-press, was entitled to the exclusive use of steam, as a motive power, however developed, for marking or printing intelligible characters.

56 U.S. (15 How.) 62, 113–14, 14 L.Ed. 601 (1853) (explaining that Samuel Morse's patent on using electromagnetism as a writing tool would pre-empt a wide swath of technological developments, even though he was the first to put the discovery into practice). The Supreme Court has more recently explained that "the underlying functional concern ... is a **relative** one: how much future innovation is foreclosed relative to the contribution of the inventor," and that the critical inquiry is thus whether an invention "would risk disproportionately tying up the use of the underlying" ideas. *Mayo*, 132 S.Ct. at 1294, 1303 (emphasis in original).

Here, the Court finds—and evidence in the '840 Patent pointed to by Defendants confirms—that the purportedly "inventive concept" claimed in the '840 Patent is the ability to utilize industry-standard, rather than expensive and/or specialized, hardware and software to create a virtual, interactive learning environment. (*See* DSUF ¶¶ 6–7, 15–17.) The Court does not find that the "inventive concept" at issue here is meaningfully different than the "inventive concept" claimed by the patents in *Alice, Bilski, Ultramercial*. The Supreme Court made clear that the mere introduction of general-purpose, networked computers into a claim or the recitation of generic computer functions to perform an abstract idea do not transform an abstract idea into a patent-eligible in-

vention. *See Alice*, 134 S.Ct. at 2357–59. Furthermore, here, as in those cases, the claims do not meaningfully limit the abstract idea of creating a virtual, interactive learning environment to a particular technological medium, and consequently foreclose substantially more future innovation than is warranted given the contribution of the inventor.

As stated by another court in this district, "the question in the abstract idea context is whether there are other **ways** to use the abstract idea in the same field." *McRO, Inc. v. Sony Computer Entm't Am., LLC*, 55 F.Supp.3d 1214, 1222 (C.D. Cal. 2014) (emphasis in original). In this case, the Court answers the question in the negative. It is difficult, if not impossible, to imagine a method of creating (or a server used to create) a virtual, interactive learning environment that does not contain (1) at least two networked computer systems that (2) create graphical representations of at least partially virtual spaces in which participants can interact by (3) simultaneously displaying some sort of "data stream." That the independent claims do not limit how the graphical classroom displays must be created, what types of data the data streams must contain, how the data streams must be displayed, or what non-generic or unconventional hardware or software must be used underscores the significant risk of pre-emption posed by the '840 Patent.[5] Thus, to the extent the "inventive concept" claimed in the '840 Patent is the ability to use industry-standard hardware and software to execute the abstract idea, the '840 Patent pre-empts the field of generating and utilizing a virtu-

---

**5.** Toward this end, the only specific limitations in the independent claims that do not recite general computer functions—the "graphical display" limitations—were construed by the Federal Circuit to mean "a graphical representation of an at least partial-ly virtual space in which participants can interact," a construction which directly embodies the abstract idea and therefore cannot meaningfully limit the scope of the claim. *Williamson*, 792 F.3d at 1347–54.

al, interactive learning environment and runs afoul of Section 101.

A comparison of the claims of the '840 Patent with those asserted in other recent post-*Alice* cases confirms the ineligibility of the asserted claims. The Court finds that this case falls somewhere between *DDR Holdings* and *Cal. Tech.* on the one hand and *Ultramercial II*, *Intellectual Ventures*, and *IPLearn–Focus* and on the other. Like the patents at issue in the former and unlike those at issue in the latter, the '840 Patent can reasonably be understood as (1) purporting to solve a problem involving computers and networks; and (2) purportedly doing so using non-routine and unconventional methods. *Compare DDR Holdings*, 773 F.3d at 1258–59 (finding the asserted claims patent-eligible in part because they "specify how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink," and in part because the "claimed solution amounts to an inventive concept for resolving [a] particular Internet-centric problem"), *with Ultramercial II* ("In sum, each of those eleven steps merely instructs the practitioner to implement the abstract idea with 'routine, conventional activit[ies],' which is insufficient to transform the patent-ineligible abstract idea into patent-eligible subject matter. That some of the eleven steps were not previously employed in this art is not enough—standing alone—to confer patent eligibility upon the claims at issue."); *IPLearn–Focus*, 2015 WL 4192092, at *5–6 (finding patent-ineligible claims that "fail to recite or disclose any non-routine or unconventional method for solving a uniquely Internet-based problem" and noting that the patentee was unable to "identify any way in which the claims 'purport to improve the functioning of the computer itself' or

'effect an improvement in any other technology or technological field' ").

Unlike the patents at issue in *DDR Holdings* and *Cal. Tech.* and like those at issue in *Ultramercial II*, *Intellectual Ventures*, and *IPLearn–Focus*, however, the asserted claims (1) lack any meaningful limitations, thus increasing the risk of preemption; and (2) are not expressly limited to the Internet. *Compare Ultramercial II*, 772 F.3d at 715–16 ("The majority of those steps comprise the abstract concept of offering media content in exchange for viewing an advertisement. Adding routine additional steps such as updating an activity log, requiring a request from the consumer to view the ad, restrictions on public access, and use of the Internet does not transform an otherwise abstract idea into patent-eligible subject matter. Instead, the claimed sequence of steps comprises only 'conventional steps, specified at a high level of generality,' which is insufficient to supply an 'inventive concept.' ") (quoting *Alice*, 134 S.Ct. at 2357), *with DDR Holdings*, 773 F.3d at 1259 ("It is also clear that the claims at issue do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same, or of any other variant suggested by NLG. Rather, they recite a specific way to automate the creation of a composite web page by an 'outsource provider.' ").

The Court concludes that the '840 Patent is substantially more similar to the patent held ineligible in *Ultramercial II* than the one deemed eligible in *DDR Holdings*. Critically, the '840 Patent is distinguishable from the one at issue in *DDR Holdings* in that neither claim 1 nor claim 17 "specif[ies] how interactions with the internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered" in the course of using a

computer. *DDR Holdings*, 773 F.3d at 1258. Although Plaintiff introduces a declaration from its expert, Dr. Souri, in which Dr. Souri's opines that the asserted claims (1) "improve the function of computers"; and (2) "address a problem that arose uniquely in the context of computers and computer networks," such extrinsic evidence is contradicted by the specification of the '840 Patent. (Souri Decl. ¶ 22.) The specification of the '840 Patent does not contain any statements indicating that the claimed invention improves the function of computers or solves a problem that arose uniquely in the context of computers and computer networks. Rather, the specification acknowledges that the "problem" of "distributed learning" was not unique to computers, reciting "[o]ne such technology us[ing] satellite broadcasts or other closed-circuit links to provide two-way video and audio communication between a teacher at a broadcast center with audience members at one or more remote classrooms." ('840 Patent col. 1:38–44.) The '840 Patent likewise touts the use of "industry-standard computer hardware and software linked by a network like the Internet to provide a classroom or auditorium-like metaphor to at least one presenter and at least one audience member," and does not purport to improve the functioning of computers or computer systems. ('840 Patent col. 2:3–6.)

■ Related to the above is the question of whether a claim satisfies the machine-or-transformation test. "While the Supreme Court has held that the machine-or-transformation test is not the sole test governing § 101 analyses, that test can provide a 'useful clue' in the second step of the *Alice* framework." *Ultramercial II*, 772 F.3d at 716 (internal citations omitted); *see also Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) (holding that the machine-or-transformation test remains an important clue in determining whether some inventions are processes under Section 101), *cert. denied*, 573 U.S. ----, 134 S.Ct. 2870, 189 L.Ed.2d 832 (2014). "A claimed process can be patent-eligible under [Section] 101 if: '(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing.'" *Ultramercial II*, 772 F.3d at 716 (quoting *Bilski*, 561 U.S. at 593, 130 S.Ct. 3218).

Plaintiff argues claim 1 satisfies the machine-or-transformation test, contending that by "provid[ing] a unique distributed learning environment that mimics real classroom experience," the method claim goes "beyond manipulating, reorganizing, or collecting data" and results in a system that provides "concrete and valuable effects in the field of electronic communications." (Opp'n at 14–15 (quoting *Card Verification Solutions, LLC v. Citigroup Inc.*, No. 13-cv-06339-VMK, 2014 WL 4922524, at *5 (N.D. Ill. Sept. 29, 2014); *TQP Dev., LLC v. Intuit Inc.*, No. 12-cv-00180-WCB, 2014 WL 651935, at *7 (E.D. Tex. Feb. 19, 2014))). Defendants respond that a generic computer system fails to qualify as a "particular machine" under the machine prong, and that none of the asserted claims transform any article into a different state or thing under the transformation prong. (Mot. 20.)

The Court concludes that the asserted claims fail the machine-or-transformation test. *Ultramercial II* is instructive. Here, as in *Ultramercial II*, claim 1 of the '840 Patent is "not tied to any particular novel machine, only a general purpose computer." *Ultramercial II*, 772 F.3d at 716. Instead, claim 1 generally recites a "computer system coupled to a network," which is insufficient to save the patent under the machine prong of the machine-or-transformation test, particularly where the patented invention boasts the use of "industry-standard computer hardware and software." *Id.* Claim 1's recitation of a "net-

work" such as the Internet is likewise insufficient to tie the claim to particular novel machine. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011) (explaining that the recitation of the Internet as a source of data does not tie a claim to a particular machine). Moreover, as in *Ultramercial II*, "[a]ny transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis." *Ultramercial II*, 772 F.3d at 717.

■ Claim 1 likewise fails to satisfy the transformation prong of the machine-or-transformation test. The method as claimed refers to providing instructions to two separate but networked computer systems to have the computer systems create graphical displays and windows for displaying data. Neither providing instructions to computer systems nor having the computer systems create graphical displays or windows meets the test because they "are not physical objects or substances, and they are not representative of physical objects or substances." *Ultramercial II*, 772 F.3d at 717. "Typically, transforming data from one form to another does not qualify as the kind of transformation regarded as an important indicator of patent eligibility." *Card Verification Solutions*, 2014 WL 4922524, at *5 (citing *CyberSource*, 654 F.3d at 1375 ("[T]he mere manipulation or reorganization of data ... does not satisfy the transformation prong.")). And unlike in *Card Verification Solutions*, where the court, in denying defendant's motion to dismiss, found that "the claimed invention [plausibly went] beyond manipulating, reorganizing, or collecting data by actually adding a new subset of numbers or characters to the data, thereby fundamentally altering the original confidential information," *id.* at *5, none of the limitations of claim 1 require that the data be "fundamentally altered" in a manner sufficient to satisfy the transfor-

mation prong. Indeed, all that claim 1 requires is that general purpose computers create "graphical representation[s] of an at least partially virtual space in which participants can interact" without specifying how the graphical display is to be created. Thus, claim 1 does not transform any article into a different state or thing. While a claim's satisfaction of the machine-or-transformation test is not conclusive, it underscores why claim 1 recites nothing more than conventional steps of implementing the concept of distributed learning using generic hardware and software.

■ Although Plaintiff does not meaningfully address the dependent claims in its Opposition, the Court finds that the remaining dependent claims add only trivial limitations insufficient to confer patent-eligibility, as they recite routine, well-known, and conventional concepts. Dependent claims 3, 4, and 5 each recite conventional data stream selection steps, including "creating a graphical display illustrating controls for" (1) "locating a plurality of data streams" (claim 3); (2) "locating a plurality of data streams originating remotely from the first and second computer streams" (claim 4); and (3) "selecting a first data stream representative of video data" (claim 5). (*See* '840 Patent cols. 10:57–11:12.) These claims simply specify a technological environment within which the abstract idea is to be implemented, and do not "purport to improve the functioning of the computer itself." *Alice*, 134 S.Ct. at 2359. As "[i]t is well established that the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment," these limitations cannot transform the abstract idea into a patent-eligible invention. *Bilski*, 561 U.S. at 610–11, 130 S.Ct. 3218 (internal quotation marks omitted). Dependent claims 18, 21, and 23 are similar to dependent claims 3

through 5 in that they describe means for selecting the streaming data in claim 17, and for the same reasons discussed immediately above, do not transform the abstract idea into a patent-eligible invention. (*See* '840 Patent cols. 12:66–14:9.) Dependent claim 6 recites the method of claim 1 "wherein computer instructions for performing the method steps are encoded on a computer-readable medium," while dependent claim 20 recites the distributed learning server of claim 17 "wherein a source of streaming content available for selection by the content selection control is a video camera coupled to the presenter computer system." ('840 Patent cols. 11:13–15, 13:10–13.) These claims also add nothing significant to the claimed abstract idea, as they merely specify a generic and conventional technological environment in which the invention is to be used. Finally, dependent claim 22 recites "a module for authenticating a user of the presenter computer system to prevent unauthorized use of the content selection control." ('840 Patent col. 14:3–7.) The specification describes the use of a conventional username and password to authenticate the user, and limiting the invention in this manner does not render the claim patent-eligible. Accordingly, none of the limitations of these dependent claims, viewed either individually or as an ordered combination, add something to the abstract idea of creating a virtual, interactive learning environment that is an "integral" or "significant part" of the invention. *Bancorp*, 687 F.3d at 1278; *see also Cogent Med., Inc. v. Elsevier Inc.*, 70 F.Supp.3d 1058, 1064 n.3 (N.D. Cal. 2014) (noting that "[i]t is important to distinguish novelty and obviousness from the 'inventive feature' inquiry required by the Supreme Court in *Alice*" and citing *Bancorp* for the proposition that "[b]y contrast" to 35 U.S.C. section 102's requirement that "a patent claim must include an element not present in the prior art ... the inventive feature question concerns

whether the patent adds something to the abstract idea that is 'integral to the claimed invention....'"). Instead, these claims describe conventional and routine concepts accomplished using computer hardware and software recited in "purely functional and generic" terms. *Alice*, 134 S.Ct. at 2360.

In conclusion, none of the asserted claims meaningfully limit the abstract idea of creating a virtual, interactive learning environment, and as a result, the Court finds by clear and convincing evidence that each of the remaining asserted claims is unpatentable under Section 101. Defendants have met their burden of proving that the '840 Patent is invalid as a matter of law and the entry of summary judgment in Defendants' favor is proper.

## III. RULING

For the foregoing reasons, the Court **GRANTS** Defendants/Counterclaimants WebEx Communications, Inc., Cisco WebEx LLC, Cisco Systems, Inc., Citrix Online, LLC, Citrix Systems, Inc., and Microsoft Corp.'s Motion for Summary Judgment of Unpatentability Under 35 U.S.C. § 101. Defendants shall file a proposed judgment consistent with this Order that addresses the claims in this action within fourteen (14) days of the issuance of this Order.

IT IS SO ORDERED.